Stuart M. KAPLAN as Trustee in Bankruptcy for Palmer Data Corporation d/b/a CompuTerminal

v.

BURROUGHS CORPORATION.

No. C 71–479 SAW.

United States District Court, N. D. California.

Feb. 4, 1977.

Joseph M. Alioto, San Francisco, Cal., for plaintiff.

Max L. Gillam and William J. Meeske, of Latham & Watkins, Los Angeles, Cal., for defendant.

## FINDINGS OF FACT AND OPINION

WYZANSKI, Senior District Judge.

This case is reduced to one issue: whether there is evidence to support a jury verdict that defendant has violated Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, as distinct from any question of state tort law.

In *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547 (1st Cir., 1974) that distinction is so sharply drawn and so cogently explained that it is unnecessary for any district judge again to tread the path of legal analysis, public policy, and historical considerations there set forth by Chief Judge Coffin. The recent, January 25, 1977 decision by The Supreme Court of The United States in *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.*, 1976, —— U.S. ——, 97 S.Ct. 690, 50 L.Ed.2d 701 applied cognate principles in a closely allied matter. Hence a district court judge's function is primarily to apply those principles to a particular case.

Here there have been three jury trials of plaintiff's [1] complaint that defendant has injured his assignor by alleged restraints of trade in violation of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1. Plaintiff's pleading and the pre-trial orders (shown in the charge appended hereto) make it clear that plaintiff does not claim that defendant has engaged in any *per se* violation, such as price-fixing or attempts to control the market by invidious practices. What plaintiff relies on is a series of defendant's actions, including an alleged conspiratorial contract and combination with Cubit, Inc., said to have been aimed at the destruction of CompuTerminal's business.

1. As here used, plaintiff means either Kaplan or his predecessor trustee in bankruptcy, Walsh.

In the first trial, before Judge Weigel, the jury returned a verdict for plaintiff of actual damages (before trebling) of over one million dollars. Judge Weigel at first set aside only that part of the verdict which determined the amount of damages, but left undisturbed that part which determined liability. In the second trial, again before Judge Weigel, another jury determined by its verdict that plaintiff had suffered no damages whatsoever. Then Judge Weigel set aside both that second verdict and the surviving or liability part of the verdict of the first jury. Thereafter, he transferred the case to me.

In a third trial, lasting over a month, before me, the jury, after my charge, returned a verdict for plaintiff in the amount of $1,162,000, before trebling. Orally, in open court, on April 28, 1976, and by written order dated April 29, 1976, I denied defendant's motion for judgment notwithstanding the verdict, but granted defendant's motion to set aside the verdict. In an accompanying brief opinion I stated that as I *then* viewed the evidence plaintiff had shown defendant's liability but had not proved such large damages as to support the size of the verdict.

By a collateral action, plaintiff unsuccessfully petitioned the Court of Appeals for the Ninth Circuit to issue a writ of mandamus to this Court to re-instate either the third jury's or the first jury's verdict. Then plaintiff unsuccessfully petitioned the Supreme Court to grant certiorari to review the judgment of the Court of Appeals. (See *Walsh v. United States District Court*, and *Burroughs Corporation*, 429 U.S. 859, 97 S.Ct. 160, 50 L.Ed.2d 137.)

His mandamus action having failed, plaintiff moved in this Court for reconsideration of this Court's April 1976 action setting aside the third jury's verdict, and, alternatively, moved that this Court "certify", as his counsel expressed it, this case to the Court of Appeals. Simultaneously, defendant renewed its motion for judgment n. o. v. and moved for partial summary judgment upon a part of plaintiff's claim of damages. On November 15, 1976, during argument upon these rival motions, counsel and this Court recognized that in the present posture of this case, no final judgment having been entered, and no direct appeal having been taken, this Court was free to reconsider both of its April 1976 orders—, the one denying defendant's motion for judgment notwithstanding the verdict and the other granting defendant's motion for a new trial.

Many months having elapsed since the third jury's verdict, and the Supreme Court, in *Brunswick Corp. v. Pueblo Bowl–O–Matic, Inc.*, 1976, —— U.S. ——, 97 S.Ct. 690, 50 L.Ed.2d 701, having held that, in private anti-trust cases of no merit, it may be appropriate to enter a judgment, on a defendant's motion against plaintiff's damage claim, notwithstanding the verdict of a jury for plaintiff, this Court has a perspective on the case. This Court has become cognizant, in the way that an appellate court might be aware, that some of the trial judge's 1976 statements during the trial, in the charge, and even in the April 1976 opinion are either erroneous or of doubtful soundness. They do not reflect as accurately as could an opinion written after the heat of battle has subsided, what is revealed by a meticulous, prolonged, and thoughtful study of the record and of the governing principles of law.

Written with the advantage of almost a year's lapse of time since the third jury's verdict, this opinion now addresses itself to what, *in the view most favorable to plaintiff*, this record shows.

Looking today at the record in the third jury trial, this Court, *disregarding and withdrawing its earlier and less-considered statements made in April 1976*, now sees the case, as viewed most favorably to plaintiff, as presenting the following set of facts.

Plaintiff Kaplan is the successor to plaintiff Walsh as trustee in bankruptcy for Palmer Data Corporation which became the assignee of CompuTerminal Corporation.

CompuTerminal planned to enter on a large scale the remote batch-data center business, but meanwhile had begun business in 1969 in San Francisco in conventional

batch-data processing. That is the business of supplying to local customers a computer service rendered upon machines operated by, and either owned or leased by, the processor. The material fed to the computer is derived from a customer's original records, which he may deliver or which the processor may collect. Before such material is so fed, it is categorized according to a system devised by the processor to suit the requirements of the particular customer.

Remote data processing differs from conventional batch-data processing primarily because the customer has electronic or like connections with a remote data center, so that records do not have to be physically transmitted.

Defendant Burroughs Corporation is one of the largest American manufacturers of computers. It has operated only once in its history a batch-data center directly serving those customers who have material to be processed by computers. This unique entry into the batch-data market occurred when, invited to do so by UNIVAC, Burroughs took over an unsuccessful enterprise which had been operated by UNIVAC, the R & S Division of Sperry-Rand Corporation. Sperry-Rand had previously acquired this enterprise from R & S. That enterprise, as lessee, used some of Burroughs' machines on which it was hardly earning the rent. When Burroughs took over the enterprise it paid to Sperry-Rand $75,000 in cash; it assumed or canceled the Sperry-Rand leases of Burroughs' B–300 machine (which rented for $240,000 a year); it took on many of the enterprise's employees; it assumed and fulfilled Sperry-Rand's obligations to customers on outstanding service contracts; and it spent another $75,000 to "clean up" customer programs.

During the time that Burroughs operated its so-called "conventional" batch-data center in San Francisco, Burroughs had leased to CompuTerminal for use in its batch-data center an old type Burroughs machine.

CompuTerminal then had a total of twenty or thirty customers for whom it had prepared individually appropriate systems, and for whom it rendered conventional

batch-data services. It wanted to expand that business, but it was more concerned with what it regarded as its long-range, potentially-profitable, major activity—the establishment of outstanding so-called "remote" batch-data centers which would occupy elaborate quarters and which would own and operate forty of the most advanced type of Burroughs computers, numbered B5500. With those objects in mind, CompuTerminal had in 1969 leased at high annual cost elaborate offices in San Francisco; it had engaged a large stand-by staff of employees; and, it had entered into a fifty million dollar contract with Burroughs to take on that company's new, most advanced machines. Both CompuTerminal and Burroughs co-operatively gave widespread publicity to this proposed acquisition of new machines.

At no time did the gross income of CompuTerminal from rendering batch-data services and from other sources come close to covering the company's out-of-pocket expenses.

During the so-called start-up period of CompuTerminal some substantial losses were predicted, some would have been foreseeable, and some would have been justifiable in the light of entreprenurial risks associated with embarking upon a new enterprise, which it was hoped would move from a condition of initial losses in getting going, to a condition of profitability after the business had acquired customers, had shaken-down its crew, had achieved a momentum, and, most important, had embarked on a program of remote batch-data center operations.

However, in its 1969–1970 start-up period the actual *total* losses which CompuTerminal sustained were so gigantic that they could not be found by any reasonable jury to have been wholly justifiable. CompuTerminal's capital was so depleted that insolvency was imminent by the end of 1969.

Nor did those who directed CompuTerminal, not even its president, Palmer, regard the total losses as corresponding to their advance expectations, or to their retrospective judgment of what was justifiable.

CompuTerminal, unable to secure the requisite financing for its proposed remote batch-data or its existing conventional batch-data processing, itself canceled its order to acquire from Burroughs the forty new computers. Two of the principal investors who had supplied CompuTerminal with additional capital, acting through their attorney, demanded that if by the summer of 1970 CompuTerminal did not turn the financial corner and make a profit it should go out of business. There is a dispute whether this demand was acceded to by CompuTerminal. But the dispute is immaterial, inasmuch as it is conceded that the demand was drawn to the attention of both Palmer and CompuTerminal's Board of Directors, and that when CompuTerminal did not turn the corner, within the time specified in the demand, its directors and shareholders in July 1970 voted to assign, and did assign, all the corporate assets to Palmer Data Corporation.

While CompuTerminal was in its 1969–1970 start-up period, Burrough's employee, Browne, who had only authority to survey the San Francisco and like operations, to observe actual and potential customers' activities, to solicit their business, and to make recommendations with respect to the continued operation by Burroughs of its San Francisco batch-data center, in a memorandum dated January 15, 1970, advised his superior, Bailey, that, of possible options open to it, Burroughs should close the San Francisco center, and should offer, to the best available buyer, the Burroughs San Francisco business,—which, in effect, meant its good-will, its customer list, and, (so far as there were any), assignable contracts which the center had had with customers. The home office of Burroughs gave Browne approval to carry out the plan.

The then situation was that over some years there had been between Burroughs, or its predecessor, UNIVAC of Spery-Rand, and twenty or so customers *written* contracts with stipulated rates. All of these written contracts had expired. The customers had signed new forms which specifically stated that they were not to constitute binding contracts until they were executed by Burroughs at its home office. No such executions had occurred. Services were, nonetheless, continuously rendered as though there had been executions. Sometimes higher rates had been provided in these unexecuted forms than in the expired written contracts. The customers paid such higher rates. Some customers assumed that Burroughs had indeed executed the originals,—although in fact no execution by Burroughs occurred until late April 1970.

Browne sought to carry through his approved plan in February and March 1970 by offering Burroughs' San Francisco center to CompuTerminal. Largely because Palmer, the president of CompuTerminal, did not believe that the customers of Burroughs were legally bound under unexecuted contracts, Palmer concluded that Burroughs had nothing to sell, and refused to buy.

Browne, irritated by Palmer, then wrote, on April 16, 1970, a memorandum to his superior Bailey advising Bailey to inform Palmer that Burroughs would take a "dim view" of future relations with CompuTerminal. The uncontradicted testimony is that Bailey did not follow that advice in that internal office memorandum. No "dim view" was, in fact, taken by Burroughs, which even continued to allow CompuTerminal to keep a Burroughs computer which was subject to immediate recapture for non-payment of rent.

The circumstances, uncontradicted by any specific evidence or any plausible inference, permit of only one interpretation: Browne's *sole* motive and intent in so writing was to injure CompuTerminal because it would not go along with Browne's plan to have it buy the center. There is not the slightest factual basis for an inference that Browne had a motive or an intent to restrain commerce, to monopolize commerce, or to engage in any of those types of misconduct which were the express or implied objects of the Sherman Anti-Trust Act.

Nor was Browne's intent, whatever it was, followed by any action of Burroughs to carry out that intent.

When Browne represented to Palmer, and later to Cubit and to Burroughs' customers that the customers of Burroughs who had signed agreements for renewal contracts were legally bound, even though Burroughs on its part had not yet formally executed such agreements, he did not make a factual or legal misrepresentation. Burroughs in rendering the contemplated services at the stipulated prices after a customer had signed an agreement became, as a matter of fact and as a matter of law, bound as effectively as if it had signed the agreement. (My earlier action in leaving the issue to the jury was erroneous.)

After Palmer rejected the opportunity to buy the Burroughs San Francisco center, Browne in March and April 1970 offered the business to Cubit. That enterprise was located in Burlingame on the Penninsula, twenty or so miles from San Francisco. In order to induce Cubit to buy the business, Browne, acting for Burroughs, (1) offered to sell to Cubit Burroughs' entire San Francisco business including an old style Burroughs B-300 which had been on the premises since UNIVAC operated the center; (2) helped Cubit to get from a bank a loan; and (3) (on a view of the evidence most favorable to plaintiff) joined Cubit in falsely representing to the bank that the whole proceeds of the loan were to purchase the B-300 machine.

If Browne made a misrepresentation to the bank (which is doubtful if the oral as well as the written evidence be considered), Browne was acting far outside his actual or ostensible authority. Burroughs did not give him, nor appear to give him, any power to help a purchaser to get funds to buy the San Francisco center. Helping a potential purchaser to get a bank loan is not within the normal range of the powers of an agent authorized to makes sales of property. Browne's representations to the bank were not authorized by, nor ratified by, nor legally attributable to Burroughs.

There is not the slightest factual basis in the bank loan, or in any other circumstances, for an inference that Browne or Burroughs or Cubit had an intent to restrain commerce, to destroy CompuTerminal, to monopolize commerce, or to engage in any of those types of misconduct which were the express or implied objects of the Sherman Anti-Trust Act. The only purpose that Browne or Burroughs had was to salvage what it could from its less than successful San Francisco operations. The only purpose of Cubit was to enter the San Francisco conventional batch-data market.

Browne, as a further inducement to Cubit to purchase the business of Burroughs' San Francisco center, promised Cubit to introduce Cubit's representatives to Burroughs' San Francisco customers. After Cubit on April 15, 1970 did agree to buy the center, Browne did make the introductions.

Browne went further by writing two sets of follow-up letters which indicated that Burroughs was transferring its San Francisco center to Cubit, that the customers' accounts were being assigned to Cubit, and that if the customers did not agree to the assignment they would be left without service after seventy days.

Most of Burroughs' customers were easily persuaded by Browne's visits and letters to make the change from Burroughs to Cubit. Some were not. Browne represented, at least sometimes, that the customer was already bound to Burroughs by an unexecuted agreement, that Burroughs had a right to delegate to Cubit performance of that contract to a competent substitute, and that, in any event, the agreement was terminable after a specified ninety day period. Such representations, as a matter of fact and of law, were true and not false or misleading. (My earlier action in leaving to the jury the question as to the right of delegation was erroneous.)

Both Burroughs and the customer having acted upon unexecuted agreements, which were in form the same as those of earlier years but were often different in rates of payment, those unexecuted agreements had become binding contracts, but terminable by Burroughs on ninety days' notice. (My earlier instruction to the jury on this point was erroneous.)

Moreover, the services rendered by Burroughs under such agreements were not "personal",—the duty to perform was delegable. The services were like those banking services which a bank customarily performs for a customer in connection with an account in which the customer makes deposits and from which he authorizes withdrawals, and which a bank, when it goes out of business, may delegate for performance by its successor bank. They could be transferred for performance in connection with the sale of Burroughs' Service Center's business, even though some of the information may have been confidential.

Although Burroughs had the unqualified right to transfer to Cubit performance of contracts of customers, without their consent, when customers objected Burroughs, as a matter of business policy, did not exercise such right, except perhaps in one or two instances.

Pursuant to its sale to Cubit by the agreement effective April 15, 1970, Burroughs then entirely withdrew from the business of rendering in San Francisco or elsewhere any batch-data services. It had no concern with CompuTerminal or with batch-data customers of any enterprise.

On July 15, 1970 the shareholders of CompuTerminal voted to sell its whole business to Palmer Data Corporation. The transfer of assets to, and the assumption of liabilities by, Palmer Data Corporation followed on July 17, 1970.

All the documents and statements of Palmer and of others associated with CompuTerminal and Palmer Data Corporation which were *contemporary* with the sale and transfer of the business make only one conclusion plausible: the transfer was effectuated solely because, quite apart from Burroughs' or Browne's activities, CompuTerminal had lost almost all its capital through CompuTerminal's directors', officers' and supporters' misjudgments of the market possibilities, of the abilities of Palmer, and of the general economic picture. This is underlined by what was repeatedly written and said by Palmer himself in 1970 and by those who were investors in and officers or

directors of the very corporation which held the only possible cause of action in this case. These individuals were connected solely with CompuTerminal, and in no way with Burroughs. Their statements were against their own interest, were not contradicted by any statements made before this action was brought, and, collectively, present an unadorned picture of failure of CompuTerminal due to factors wholly independent of Burroughs.

Nor is there in the *contemporary* 1969–1970 documents, accounts books, statements, or other evidence the slightest ground for regarding as even a secondary or minor cause of CompuTerminal's failure the conduct of Burroughs, or of Browne, or of anyone associated with the defendant.

Despite this clear picture which the contemporary evidence discloses, Palmer, long after the collapse of CompuTerminal, claimed that CompuTerminal had been damaged by alleged violations by Burroughs of the Sherman Anti-Trust Act.

As page after page of the transcript vividly portrays, Palmer at the trial of this case shifted his testimony with flexibility. Responding to his counsel's suggestions, he trimmed his opinions to meet developments as the evidence in one day's testimony after another day's testimony seemed to make desirable.

Palmer on the witness stand took the position that CompuTerminal had lost its capital and its potential profits due to statements made by Browne and other employees of Burroughs to Burroughs' customers to disparage CompuTerminal as a possible substitute service-center when Burroughs went out of business, and due to "coercive" tactics Burroughs followed in inducing its former customers to go to Cubit instead of to Burroughs.

*This was mere argument, not conclusions tied to any specific evidence.* Indeed, as noted above, the testimony was the other way. There was no evidence whatsoever that Burroughs' representatives either directly or indirectly disparaged CompuTerminal or "coerced" Burroughs' customers to accept Cubit as Burroughs' delegate for

performance. Nor did Burroughs have any anti-competitive plan to put CompuTerminal out of business. On the contrary, Burroughs for a long time hoped to have CompuTerminal as its customer for a large order of its best machines, and did what it could to help CompuTerminal buy such equipment. Moreover, when CompuTerminal did not pay on the due date the rental on its leased Burroughs' machine, Burroughs did not promptly remove the machine and cancel the lease. Not until CompuTerminal became obviously insolvent did Burroughs assert its recapture rights.

Palmer sought to fill the gap in specific factual evidence by so-called expert opinion. *This was not in fact opinion evidence but consisted of statements which were unsupported by factual testimony* and were inflationary, inaccurate, imaginative, and inconsistent. Palmer ignored the obvious facts that CompuTerminal was a business which never had much capital, which had not developed the market which Palmer had predicted, which had no longer enough working-capital to continue business, and which was being pushed by its principal investors to close its doors because it was over-extended.

No responsible judge could allow to stand a jury verdict which reflected Palmer's unsupported so-called expert opinions and methods of so-called calculation.

The analogies between *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra,* and the instant case are striking. To be sure, that case arose under Section 7 of the Clayton Act, whereas this case is claimed by plaintiff to arise under Section 1 of the Sherman Act. The penumbra of both sections of statutory law and the canons of interpretation make the two cases cognate. Each of the statutory sections is directed only at so-called anti-competitive conduct and anti-competitive intention; and where neither conduct nor intention is anti-competitive, then neither the Clayton Act nor the Sherman Act is violated.

Hence it is highly significant that the *Brunswick* case and the case at bar are so similar in their essentials. In *Brunswick* a manufacturer, solely in order to salvage its interest in its equipment which it had sold to an enterprise, took over the business of the user of the manufacturer's machinery; here, a manufacturer, solely in order to salvage its interest in the use of equipment which it had leased to an enterprise, took over the business of the user of the manufacturer's machinery, and, then when the manufacturer found that the take-over was not advantageous, solely in order to continue the efforts at salvage, disposed of the machinery and the acquired business, after first offering it to plaintiff, to the best available purchaser, Cubit.

In sum, here as in *Brunswick* we have nothing but a complaint that plaintiff did not like the competition of a manufacturer who had no intent to put plaintiff out of business, but who merely engaged in a salvage operation.

Moreover, here there is not even proof that the salvage operation of defendant, and its activities in transferring its customers to Cubit, had the slightest effect on plaintiff, which went out of business for totally unrelated causes.

Therefore, as a first step, this Court is bound to and does enter its *order setting aside the verdict.*

Moreover, the Court, having reviewed the evidence in the perspective of many months' consideration, must go further. Despite what this Court earlier said during the trial of the case, in the charge to the jury, and in its April 28, 1976 opinion, the Court must also, and now does, enter a *judgment for the defendant notwithstanding the verdict,* on the ground that there is wholly lacking evidence which shows that defendant had any anti-competitive intent of the kind required to maintain a claim of a *non per se* violation of Section 1 of the Sherman Anti-Trust Act. See *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* and *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* both *supra.*

The text of the previous paragraph and the only two citations used or needed as supporting authorities make it plain that in this Court's opinion plaintiff's case fails be-

cause of want of proof that Burroughs violated the federal anti-trust laws. Whatever may be said of (1) the Browne-Bailey correspondence, or (2) Browne's or others' representation to Burroughs' customers or to Cubit about the existence of ongoing contracts which the customers had with Burroughs, which Burroughs could delegate for performance without the acquiescence of the customers, and which Burroughs could terminate on ninety days' notice, or (3) Browne's or others' representations to a bank which lent money to Cubit, or (4) Browne's or others' representations to Burroughs' customers with respect to Cubit's capacity to do batch-data work—all those and all other representations and actions by Burroughs' agents were totally without an anti-competitive or restraint of trade intent, purpose, or effect. At most, they may have been in some instances representations which violated the tort law of some state; yet even this is doubtful.

Out of an abundance of caution, it is important to add that not only did Burroughs not violate federal anti-trust law, but also that nothing done by Burroughs (even if it violated state law) was a cause (large or small) of even a nominal loss sustained by CompuTerminal. The *sole* causes of loss by CompuTerminal were Palmer's misjudgment of its potential market, Palmer's mismanagement of its business due to extravagant expenditures for quarters and staff, an economic recession affecting the demand for batch-data services, want of harmony between Palmer as manager and CompuTerminal's investors, the failure of CompuTerminal to get hoped-for financing to enable it to acquire about fifty million dollars worth of equipment, and the unreliable character of Palmer.

*Defendant's motions to set aside the jury's verdict and to enter judgment for defendant, notwithstanding the verdict, are both granted.*

## APPENDIX

THE COURT: Good morning, ladies and gentlemen of the jury.

It is exactly one month tomorrow since you first appeared in this case. I promised you that the case would last about three weeks, and I made that statement on the basis of bona fide representations to me by counsel.

You have been, really, very faithful in attendance and, also, so far as I have observed, in attention to this case. I want to congratulate you for having paid such close attention to a case which certainly is not the most exciting one being conducted in the United States District Court for the Northern District of California.

We have arrived at the stage at which counsel are about to address you in argument. I am, thereafter, going to charge you with rather lengthy instructions as to the applicable law. But I think it would be worthwhile for me to give you some preliminary instructions which you are to regard as part of the charge in the case.

I am going to give these preliminary instructions not with the idea of in any way foreclosing counsel's opportunity to argue fully, but to make sure that you see the bearing of the arguments as they are addressed to you.

I want to make it entirely clear that neither expressly nor impliedly have I taken any view of which side ought to prevail in this case. And I do not intend, either now or later, to indicate to you what view, if any, I have with respect to who should win this case.

I do not have to tell you that there is always a risk that jurors will infer that a judge has an attitude when he makes a ruling on some point of evidence or makes some comment to counsel. If you have inferred from anything that I have said or any nod of my head or any gesture of any tone of voice or anything else that I believe that either the plaintiff or the defendant should win this case, you are quite mistaken in that inference. When I want to tell a jury that I think the plaintiff ought to win or the defendant ought to win, I will say so. I will make it absolutely clear. And I have no intention of doing anything like that in

this case. I never had any intention of doing anything like that.

You, as a matter of fact, have listened to a very well-presented case by both the plaintiff's counsel and the defendant's counsel.

I have listened to quite a number of cases in four decades, and I unhesitatingly say that this has been one of the better presented and certainly one of the more interesting, from a judge's point of view, of the cases that I have heard.

While I am saying that counsel did a good job, I think you also realize that the court reporters and the clerk have been doing a very good job in this case, and making it easier for all of us.

When I give instructions on the law, you are required to follow what I say is the law. That is not because I am infallible. I am far from infallible. There would be no job for the Court of Appeals if I were infallible. The Court of Appeals is set up for the very purpose of correcting the errors of trial courts, and it is expected a trial judge will make a certain number of errors. But you jurors are not to correct me on points of law. You have to take what I say as the law, and, if counsel think I made a mistake, they will have a right to appeal to the Court of Appeals and, in some instances, to the Supreme Court of the United States.

You, however, are the judges of the facts in the case, and anything that counsel say or I say with respect to the facts of the case you are entirely free to disregard. It is your memory and it is your appraisal of the witnesses that count.

Needless to say, in arguing to a jury, counsel will have to make reference to their recollection of the testimony and their view of the facts; but that is not binding upon you. You are to form your own opinion of what are the facts in the case and what is the credibility of each of the pieces of evidence.

With respect to evidence, let me say that there is, in a case like this, no legal difference between written evidence in the form of exhibits or otherwise and oral evidence.

You may believe, as you like, written against oral or oral against written, or some combination of oral and written.

It is usual, and it will happen in this case, that the jury takes out into the jury room the written and like physical exhibits.

The jury does not take out into the jury room the transcript of the oral testimony. But that does not imply in any way that the written exhibits are more reliable than the oral testimony.

Although the oral testimony is, for the most part, available now in transcript, the transcripts have not only the evidence which has been admitted but has some other material which took place when you were not here. There are colloquies between counsel and the Court, and the like. We cannot send to you the transcript because it has in it material that wasn't presented to you and doesn't concern you.

If, during your deliberations, it is absolutely necessary for you to have your recollection refreshed with respect to some oral testimony, it is permissible for the Foreman, on behalf of the jury, in writing, to request the Court to have read to the jury some designated portion of the transcript.

I hope it won't become necessary for you to do that because, speaking generally, it is very difficult to pick one part of the transcript without raising a doubt in counsel's mind as to whether other parts of the transcript ought to be read at the same time. And there is a dingdong going back and forth like a bell between counsel, which generally adds more noise than light.

Your own recollection of the total testimony is likely to be just as good as your selection of any particular portion for a reading. But it is up to you. I am merely telling you what I have learned from some years of presiding over jury trials.

It will be your function, the moment you go out, to select, in accordance with your own preference, a Foreman of the jury. Let me tell you that in Massachusetts the judge names the Foreman. But I follow here the local practice which allows the jury to select its Foreman.

All communications from the jury should come in writing through the Foreman, should be written by the Foreman and not spoken orally, should be written on a piece of paper and put inside an envelope and delivered to a Deputy Marshal or someone else and brought to me. If appropriate, I will bring you back in the courtroom and will read your question or comment aloud to counsel and will then decide whether to answer the question or respond to the comment.

One thing I strongly urge that you bear in mind is that we do not at any stage want to know about your deliberations until you reach a conclusion. I do not want at any time to be told that the jury stands four-to-two for the plaintiff or defendant or anything like that because the silence with respect to your deliberations, until you speak finally, is part of the condition of a good jury verdict.

With respect to the three alternate jurors who have been as faithful as the six other jurors, I will now say to you that you are still alternates in the case but you will cease to be alternates when I have concluded charging, not today, but tomorrow. You will then be free to leave and do what you like.

I am not now directing you to do this, but since, I think, there are three of you, you might find it amusing to go lunch or dine together or get together and consider how you would have decided the case were you the jury. You don't have to tell us, but it might be some kind of intellectual reward for the performance through which you have been going.

Now, I am going to say a word or two more about the case in general, rather than in particular, and I am going to make remarks which are like those I would make in any court and jury and case.

Unless I tell you otherwise specifically, and there is one minor matter on which I am going to give another instruction specifically, the plaintiff has the burden of proof on all the issues in this case. The plaintiff is the claimant, and the plaintiff has to establish each one of what will turn out to be the three principal links upon which it hopes to have an effective chain to a point of judgment.

Those three links, about which I will say more later, are these:

The plaintiff will have the burden of proving that the defendant violated Section I of the Sherman Act, a federal statute.

The plaintiff will have the burden of proving that that violation was a substantial cause of injury to the plaintiff; and,

Third, the plaintiff will have the burden of proving the amount of recoverable damages in the sense that the plaintiff must prove by a preponderance of the evidence that there was damage as a result of the violation claimed.

I will say more about this in elaboration at a later stage.

Now, let me make it quite plain that this is not a criminal case; this is a civil case.

The plaintiff's burden is not to prove each of these three items beyond a reasonable doubt. That would be the test if it were a criminal matter. What the plaintiff has a burden to do is to prove by a preponderance of the evidence. That means that on each of these issues you must be persuaded that the weight of the evidence favors the plaintiff and that you have heard enough evidence to be satisfied that the plaintiff has proved the point.

If, for example, the plaintiff, in your view, needs a particular item of evidence in order to prevail, it is the plaintiff's duty to produce that evidence; it isn't the defendant's duty.

In determining what is the weight of the evidence, you do not proceed by counting the number of witnesses for the plaintiff and then counting the number of witnesses for the defendant and seeing who has more witnesses. What you take into account is the evidence that you find believable; that is, credible.

It is quite possible—I don't say that is the situation in this case—that a single witness may outweigh a multiplicity of witnesses. Perhaps I have already said to you, I so

often say it that I don't know whether I told it to you earlier, that one child may outweigh ten bishops; it depends entirely upon whether you think that the testimony is truthful.

When it comes to problems of truthfulness, there is in law no difference between an ordinary witness and a so-called expert witness or a so-called opinion witness. People are ordinarily limited in testifying to what they, themselves, have observed, what they, themselves, have seen or otherwise perceived through one of their five senses. They are not ordinarily allowed to talk about hearsay or things which they know, if they know at all, secondhand, by rumor and gossip, and the like.

The so-called expert or opinion witness is allowed to testify not only with respect to what he has observed, but he is allowed, if the Court thinks he is sufficiently qualified to speak to the jury, to tell his expert opinion. The mere fact that a Court allows someone to testify as a so-called expert or opinion witness does not mean that the Judge in any way guarantees the reliability of the witness. That expert or opinion witness is exactly like any other witness, a person whose credibility is to be estimated by the jury.

It would be a greater error for me to give you the impression that there are any rules of law for determining who is a truthful witness. The law, in cases like this, relies on you, as jurors, to exercise your common sense and your general experience in determining who is telling the truth.

It may or may not help you to bear in mind certain not so much principles as cautions.

A witness who has an interest in a matter is likely to be biased. But one also ought to remember what Judge Learned Hand used to say, that there are people who have a bias against bias. There are people who are so straightforward, so upright, that they are able to discount their own interests and speak modestly and with restraint about matters where they are selfishly concerned. And there are others who exaggerate and boast and, in ways, inflate their own importance and their own interests.

There isn't any rule; it is up to you.

It is also sometimes said in Latin, which I won't use any more, that if you are false in one thing, you are false in all. Common sense tells you that isn't true or may not be true. Because a man lies about one thing, he may not lie about another. Because he is mistaken about one thing, he may not be mistaken about another, or he may, by repeatedly being false and repeatedly lying, indicate to you a degree of unreliability which you take into account.

There is no question that, when you look at a piece of testimony, you take into account what your overall impression is of the witness' reliability. Is he the sort of person who can discount his bias? Did he accurately observe what he is reporting? Has he a good memory? Has he talked about the same matter previously or testified about it or given a deposition about it, and is he consistent or is he wavering? Does he contradict himself? Is he the sort of individual who seems to be a man of principle, or is he a person without any steadfastness at all? All these considerations are those that you apply in ordinary life, and they are no different in a courtroom.

There is a great advantage in a jury in that it is a body with a number of different people on it, and you have different experiences. Some of you are men, some of you are women; some of you come from one background, some from another; some have had one kind of work occupation, some another; some are of one age; some of another; and your pooled experience, that is to say, taking into account your different points of view, makes it quite likely that you will come to a sound conclusion with respect to the reliability of witnesses.

While it isn't one hundred percent true, it is very nearly true that the reason that we have juries in this kind of a case is because it generally turns out that the real problem is a problem of credibility of witnesses. If everybody was agreed on the facts, there

would be only a problem of law, and then the Court would decide it.

Here, the parties obviously are not agreed upon the facts. They differ as to the credibility of witnesses, and they will argue to you, undoubtedly, from different points of view as to how they view the witnesses.

So that you may have clearly in mind what these issues are, I am going to have passed to you at once the joint pretrial statement.

(To the Clerk) Will you please pass it?

(A document is passed to the jury.)

THE COURT: Do you have it? Good. Will you please turn to it?

Now, look at the introduction. The joint pretrial statement is filed by the parties to this action. The plaintiff, Edward Walsh, Trustee in Bankruptcy for Palmer Data Corporation, d/b/a—that means doing business as—Computerminal, hereinafter Computerminal or Palmer, and the defendant, Burroughs Corporation, hereinafter Burroughs, pursuant to Rule 105 of the Local Rules of Practice, and so forth.

I won't have to read that because that is just a formal statement.

Now, turn to line 27 on that page. This is a private civil antitrust action alleging a violation of Section I of the Sherman Act, 15 USC—that means 15 United States Code—Section I. That is a statutory reference that enables the lawyers to find the full text of the law. Arising out of the sale by Burroughs of its so-called batch-processing business in San Francisco to Cubit, Inc., hereinafter Cubit.

In April, 1970, plaintiff contends that the Burroughs-Cubit transaction violated Section I of the Sherman Act because it denied the plaintiff the right to compete for such business. The defendant denies such contention.

You will see a problem with respect to jurisdiction and venue. You do not have to concern yourself with that because it is now stipulated between the parties that this Court has jurisdiction over this case. That does not mean that there is any agreement that a violation occurred, it merely means that there is involved that kind of business which permits you and me to hear the case.

There is, in fact, a very real difference of opinion between counsel with respect to whether, if there was anything unlawful, it was unlawful under federal law as distinguished from unlawful or impermissible under state law.

As I will make abundantly clear later when I charge you tomorrow, you can find for the plaintiff only if you are satisfied by a preponderance of the evidence that the defendant has violated federal law. You are not here for the purpose of passing on any question of state or local law except as it is drawn into some kind of connection with the federal law.

I drop a footnote at this point to say that there are some rather difficult questions of local law as to whether there were, indeed, or were not, indeed, contracts in 1970 between the Burroughs Center in San Francisco and its customers and, if there were such contracts, whether they were freely assignable in the sense that they could be performed validly by another concern different from the Burroughs Center. Those are incidental questions of local law that you are going to have to consider.

But, speaking generally, here we are dealing with a claim of violation of federal law and you are in a federal court, as you, I hope, well know.

Now, I don't have to say anything about the rest of this sheet.

I am now going to tell you that you ought to look at the complaint for and answer damages. You will, in accordance with the regular rule, take out with you the plaintiff's complaint and the defendant's answer, so far as they are relevant. There are some little matters which have been blocked out because they don't concern you.

I underline the point that the pleadings are in no sense evidence. They are not exhibits. They are just written arguments, as it were. They are statements by the plaintiff and the defendant of the positions

they are going to take in the case. Nothing in the pleadings is evidence.

If you will look at the complaint for damages, you will see there is a lot about jurisdiction and venue, which I don't have to refer to. And you will see the description of the parties, and there is not much quarrel about that.

Of course, the moment you begin to talk about co-conspirators in the complaint, then you are getting into a territory where there is obviously a difference in opinion between the plaintiff and the defendant.

Then you will see part four, beginning on page three, about the nature of trade and commerce, and this may or may not help you, but you don't have to decide any issue as to whether or not there is interstate commerce involved because there is a stipulation between the parties that there is that kind of effect upon interstate commerce which gives this Court jurisdiction of this case. That is a matter which has been adequately dealt with by stipulation so that you don't have to concern yourself with it.

If you will turn to page five, you will notice offenses charged. Then you will see paragraphs 17, 18, and 19, and so forth. I think it is worthwhile for me to read these, particularly because paragraph 19 deserves your special notice.

Paragraph 17: In or about February, 1970, defendant elected to withdraw from the business of operating a computer service center in San Francisco for batch-processing customers whose computer needs were programmed from Burroughs' computers. All or substantially all of the batch-data process customers then being served by defendant had entered into, the complaint says, non-assignable contracts.

Now, mind you that is a matter of dispute whether that is true or not, but that is what the plaintiff says.

All or substantially all of which had been signed by a duly-authorized representative of the customer but which had not been signed by any representative of defendant. Whether that is true or not is up to you.

Paragraph 18: On or shortly after the date on which defendant elected to withdraw from batch-processing computer service operation in San Francisco, it solicited plaintiff to purchase its contract customers for the sum of $150,000.

Paragraph 19: When plaintiff declined, defendant entered into a contract and/or agreement, expressed or implied, with Cubit, Inc., a subsidiary of Purity Stores, Inc., under which, in consideration of an amount paid to defendant by Cubit, Inc., the exact amount of which is unknown to plaintiff, Burroughs would divert its then-existing customers to the computer service center of Cubit in Burlingame, California, which up to that time had confined all or substantially all of its computer time to its parent, Purity Stores, Inc. The aforesaid contract—look at this carefully—the aforesaid contract between defendant and Cubit is, itself, a contract in restraint of trade in violation of Section I of the Sherman Act and evidences a combination and conspiracy between defendant and Cubit and/or all or substantially all of the customers whose business was, in fact, diverted to Cubit in violation of Section I of the Sherman Act.

Now, those lines, 17 to 23 are contested and denied, and they form in one sense the most critical issue as to whether or not there was any violation of federal law in this case.

Let me point out to you what is claimed here is that the aforesaid contract between defendant and Cubit is itself a contract in restraint of trade in violation of Section I of the Sherman Act and evidences a combination and conspiracy between defendant and Cubit and/or all or substantially all of the customers whose business was in fact diverted to Cubit in violation of Section 1 of the Sherman Act.

And now let me ask you to look back again at the joint pre-trial statement which you had in your hands a few moments ago. And if you will look at the bottom of page one line 27 you will see what I read to you already, the statement that this is a private civil antitrust action alleging a violation of Section 1 of the Sherman Act arising out of

the sale by Burroughs of its so-called batch processing business in San Francisco to Cubit, Inc., hereinafter Cubit, in April, 1970.

The plaintiff contends that the Burroughs-Cubit transaction violated Section 1 of the Sherman Act because it denied the plaintiff the right to compete for such business. The defendant denies such contention.

Now, that is a pretrial statement made by both parties with the approval of a federal judge and narrows the issue, and nothing outside of that would be permissible in the consideration of the issue of liability or no liability in this case.

Now, I have not referred in detail to the answer which you also have in front of you. And I am not going to find it necessary to read this answer, because I think I have pointed out to you by referring to the pretrial statement the denial which is made by the defendant. The defendant does deny very definitely these allegations in Paragraphs 17, 18 and 19.

Turn to the Page 4, look at line 15, and you will see the defendant denies each and every allegation of Paragraph 17. You will see the defendant in line 22 denies each and every allegation of Paragraph 18. In line 27 you will see that the defendant admits the allegation of Paragraph 19, that it sold its San Francisco batch processing operation to Cubit, Inc., but is without knowledge or information sufficient to form a belief as to the truth of the allegation that Cubit had confined its computer time to the parent.

Defendant denies each and every other allegation of such paragraph, and specifically denies that the sale of its San Francisco batch processing operation to Cubit is a contract in restraint of trade, or that it evidences any combination or conspiracy of any nature between Defendant Cubit or any other person or entity.

Now, there are a lot of other things and I am not trying to say that you shouldn't read those other things, you should. But I have said what I think will be helpful, I

hope so, in having the arguments understood by you as they are made by counsel.

Now, I am going to tell you that I will not be able today to charge the jury in full. The arguments of counsel will take a long time, and I will continue my charge tomorrow. I am going to ask each of you, and that will include the three alternates, because we don't know until I finish the charge whether all the six jurors first selected will survive to the end of the charge, to come to Court with a bag and contents sufficient so that if you have to stay overnight on Thursday night and if you have to stay overnight on Friday night you will have the necessary toilet articles and change of clothing. I have made reservations for a hotel accommodation for each of you for tomorrow night. It may very well be that you will finish the case, we would all be very happy if you finish the case promptly, but we are not sure, and you can't be sure, and so I tell you to come in tomorrow with the appropriate clothing lest you be held overnight on Thursday, tomorrow, and lest you be held overnight on Friday.

THURSDAY, FEBRUARY 5, 1976
    9:30 O'CLOCK A.M.

THE COURT: Corrections on the record.

2693, line 7, after the word "such" the word "as."

Line 17 after "119" insert "Fed Sup."

2695, line 1, "struck" is misspelled.

2705, line 8, the word is "great" not "greater."

2706, line 1, the word is not "with" but "in" in the middle of that line.

Line 14 the word "wavering" is misspelled. The "wavering" here involved is w-a-v-e-r-i-n-g, only one i.

Page 2709, line 23, I am sure I did not say the words "for damages." I think I must have said "and answer."

2710, strike the words "for damages."

Line 17, the phrase is "trade and commerce" not "trade in commerce."

Thank you very much.

(Proceedings held in open Court in the presence of the jury.)

THE COURT: Good morning, members of the jury.

Ladies and gentlemen, yesterday before counsel argued I gave you some instructions, and I am now going to complete my instructions, and I shall first deal with points of law as to which what I say binds you. Thereafter, and I will make it quite plain when the break occurs, I shall turn from points of law to what seem to me to be analytically the factual problems in the case. When I come to this analytical part, whatever I say you are wholly free to disregard. I shall try to be fair to both parties in the analysis, but when a judge deals with factual questions even by way of analysis or illustration, the jury is not bound by what the judge says.

The only reason that I will engage in this analysis is because this is a case which has lasted five weeks, is in its essence very complicated, and falls within a field where perhaps I have had an experience which is worth laying before you for such appraisal as you see fit. In that analysis, however, I no more bind you than counsel bind you by their arguments. I will make it quite plain when I come to the analysis as distinguished from the instructions which are binding upon you with regard to the law.

You recall that yesterday when I began the instructions to you, I circulated to you the pretrial order in this case and I read it to you while you had it in your hands. That pretrial order was signed by counsel for plaintiff and counsel for the defendant and by one of the regular judges of the United States District Court for the Northern District of California. I had no more to do with it than you had. But, that is a pretrial order which becomes binding upon you as upon me, as well as upon the parties. Neither you nor I has any right as the pretrial order stands in its unamended form, to go outside the scope of that pretrial order in considering what are the issues in this case. That doesn't mean that we can't subdivide the issues, but we can't bring into the case entirely new issues, new parties or anything which is not fairly within the coverage of the pretrial order.

The parties engaged in their pretrial discovery and in their preparation of this case in the light of the pretrial order. I made my rulings during the case in the light of the pretrial order, and your verdict and my charge should be within the scope of that pretrial order.

Now, I need not remind you, I think, that anything that counsel has said or that I have said or will say about the credibility of witnesses is merely intended to help you and does not control you. You are the persons who are to decide which witnesses to believe, which exhibits to believe, if you believe any of them. You are not required to believe anything, it's entirely up to you. And as I said to you, there is no rule of law which tells you that one kind of testimony in this case is better or worse than another kind. And the standards that you will apply in judging the truthfulness of witnesses are primarily the standards of common sense and ordinary experience.

Now, I have already said to you also that there are, as both sides agree, no problems now of whether interstate commerce is involved in this case. So far as you and I are concerned, the parties have agreed that insofar as interstate commerce is a fact necessary to prove with respect to jurisdiction or with respect to substance, there is an agreement to treat the fact as though it has been adequately proved. Don't bother about interstate commerce at all. From now on forget it.

It's also agreed between the parties, as you can tell from the pretrial order, that there are three main issues in this case. First: Did the Defendant Burroughs Corporation violate Section 1 of the Sherman Act by engaging in a combination, conspiracy or contract in restraint of trade, as that term is used in the statute called the Sherman Act, an act passed in 1890.

The second issue is whether if there were such a violation, was that violation the proximate cause, was it a substantial cause, not necessarily the only cause, of injury to the plaintiff. And the plaintiff in this case

is the trustee in bankruptcy Walsh, successor by operation of law to Palmer Data Corporation, which, in turn, acquired any claim that Computerminal Corporation had with respect to antitrust or any other dispute.

You will not have to bother at all with the fact that the plaintiff's name is Walsh. You and I aren't the slightest concerned with how he got this claim, but the claim that he makes is in essence a claim which originally was Computerminal's, and which passed by assignment through an intermediate step to Walsh.

The third issue in this case is whether if there was a violation of Section 1 of the Sherman Act by Burroughs Corporation, and if that violation was a substantial cause of injury to Computerminal Corporation, what are the recoverable damages. On each one of those three issues, the burden of proof rests upon the plaintiff. The burden of proof is the burden of persuasion, it does not mean persuasion to a moral certainty or beyond a reasonable doubt, it merely means persuasion in the sense that you have concluded that it is more probable than not that the plaintiff has proved Item 1, Item 2, Item 3. The plaintiff gets absolutely zero unless he proves one plus two plus three. It will not do to succeed on one and not on another. All three of those items are essential for a recovery by the plaintiff, insofar as the plaintiff bears the burden of proof, and in your view that proof ought to include some item, if the item is missing then the plaintiff is to be blamed, not the defendant.

If in your view in order to satisfy the burden of proof, for example, certain customers or certain officers or certain other persons knowledgable in one way or another by observation or in any relevant way are not here, and in your view out to be here on the issues where the plaintiff bears the burden of proof, you cannot fault the defendant for the failure to bring these people. It is the plaintiff's obligation to bring the proof which satisfies you with respect to each of these issues.

Now, I'm going to turn to a general discussion, still as a matter of law, of the Sherman Act, and I think it is very necessary that you bear what I say in mind here carefully in your minds, because there was some argument which I think was in a direction contrary to what I am going to say, and what I am saying is binding on you.

When Congress passed the Sherman Act in 1890 it did not purport to deal with the whole field of unfair competition. I am not referring to the fact that it didn't deal with local as well as interstate matters. What I am saying to you is that Congress in the Sherman Act dealt with only some but not all kinds of unfair competition.

For example, Congress didn't deal with breaches of contract in ordinary cases. Congress did not deal with fraud, in ordinary cases. Congress did not deal with interference with advantageous business relations, in ordinary cases. Congress did not even deal with all unfair methods of doing business in interstate commerce. It was not until much later in the administration of Woodrow Wilson that Congress endeavored to reach unfair methods of doing business in interstate commerce, and then when it did it left the supervision of them to a commission, an administrative body, the Federal Trade Commission. There are some kinds of unfair means of doing business which are plainly unfair, some kinds of unfair competition which are plainly unfair, which are not covered by the Sherman Act.

There are many reasons for that. The Sherman Act in some of its aspects carries criminal penalties as well as civil sanctions. You are not dealing with the criminal side of this. Moreover, there are certain kinds of civil advantage which I am not going to discuss with you, because they are not your concern, but they are advantages which a plaintiff gets in this kind of proceeding which he would not get in an ordinary unfair competition suit either in the federal or state courts.

So what you are here dealing with is a very special kind of statute. It has two main parts to it on the side of what is

outlawed or forbidden or regarded as a violation, and one section has to do with combinations and contracts in restraint of trade, and that's covered by Section 1.

And the other part with which you are not the slightest bit concerned, is Section 2 which relates to monopolizing or attempting to monopolize commerce. Now this case has nothing to do with Section 2 of the Sherman Act. The pretrial statement makes it quite plain that what we are dealing with here is a claim of the violation of Section 1 of the Sherman Act, which is directed at combinations, contracts and conspiracies in restraint of commerce. I am not going to spend any time talking to you about what the word "combination" means, or the word "contract" means, because I think it is quite plain to you at once that the words "combination" and "contract" involve the participation of more than one person.

If there is a restraint of trade participated in by more than one person and one of the persons has a purpose to accomplish the restraint and get the support of another person, it doesn't make any difference whether that other person shares the first person's purpose, motive or the like, it is sufficient that one of the parties to the combination has the specific intent and the other cooperates willy nilly. But the real difficult problem, and it's so difficult that nine justices of the Supreme Court wouldn't agree on the point, is to define accurately the phrase "restraint of trade."

What every informed judge and justice would tell you is that it doesn't mean every restraint of trade. Ever since the time that, as he then was, Associate Justice Edward Douglas White in 1911 decided the *Standard Oil* and *American Tobacco* cases, it has been clear that the only restraints of trade which the act applies to are unreasonable restraints of trade. That doesn't help you very much, but at least you know that there are some kinds of restraints of trade which are covered and some that aren't. Mr. Justice Brandeis helped us a little bit more a half a dozen years later when he told you that you look at all the surrounding circumstances under which the restraint operates, and he pointed out what everybody always quotes him as saying, that every contract binds and restrains and it cannot be true that every contract is an impermissible restraint of trade.

Let me give you an example not unlike one I gave you the other day, perhaps a little closer to the problem here, A owns a business. X wants to buy it, Y wants to buy it, Z wants to buy it. A makes a contract to sell it to X. There were no other facts but those I have told you. Can it be that that contract is an impermissible restraint of trade? Of course it is a restraint which prevents Y from buying the business, because A is selling it to X, it's a restraint which prevents Z from buying the business, because A is selling to to X. But if you said that this was an impermissible restraint of trade then A couldn't sell the business to anybody. So it must be a reasonable restraint of trade, if all that is involved in the situation is that a person who owns a business and enters into a contract to sell it to one of a number of different persons and other persons are thereby, as it were, restrained from buying it. But now let me add another possible fact to the hypothetical case I have put.

Suppose that A is a very important factor in the market and has, let us say, 30 percent of the business. And let us suppose that X has 30 percent of the business, and Y and Z each have 20 percent of the business. And under these circumstances A, without giving Y and Z an opportunity to bid on the situation, sells his 30 percent to X who already has 30, and the new AX company has 60 percent of the market. Under those circumstances where the sale promotes or might be thought to promote an attempt to monopolize the market and to subject Y and Z to competition by an overwhelmingly strong antagonist, it very well might be that there is an impermissible unreasonable restraint of trade in that combination.

Now, with respect to restraints of trade I have to give you some general background, rather briefly, but in order that you may understand what this phrase "specific in-

tent" means, which was used to you in argument and which I shall have to use in my charge.

First, let me tell you what the words "specific intent" as used in connection with Section 1 of the Sherman Act mean. Specific intent as there used means an intent either to monopolize or to exclude from the market, or engage in that kind of anticompetitive conduct which, as it were, freezes somebody out of the market or squeezes in a way which indicates something more than normal competition, speaking generally on a wrongful act of a defendant which might possibly injure a competitor. But I told you quite a few moments ago that the Sherman Act doesn't cover every wrongful act. It doesn't cover every breach of contract. It doesn't cover every fraudulent act. It doesn't cover every kind of interference with advantageous contractual relations. It doesn't cover every kind of disparagement. It doesn't cover every kind of unfair method.

In order to satisfy the phrase "specific intent" as I said to you a moment ago, there must be, when specific intent is required, an intent to monopolize or to exclude from the market or to freeze out of the market or to squeeze by a peculiarly anti-competitive method. Merely injuring is not enough. Breaches of contract injure, or may. Frauds injure, or may.

Now, there are certain situations in which the plaintiff in order to succeed in a Sherman Act proceeding is not required to prove specific intent, because by a series of prior cases and rulings the courts have reached a conclusion that when you engage in a conduct of a certain kind there is an implied specific intent to monopolize, to exclude, to freeze, to squeeze, or whatever you like.

For example, if dominant forces, dominant enterprises in a given market, agree to fix and maintain prices that is what is called in a Latin phrase a per se violation. That is on its face and by itself it is a violation of the law, and no matter what intent the parties had, it is a violation of the antitrust laws, provided that they are dominant enterprises in a market. Never mind what the reasoning back of it is, just accept what I tell you, that under those circumstances specific intent need not be proved by the plaintiff in order to succeed.

If he proves a price agreement among dominant enterprises in the market, that's enough, provided he also shows, of course, that that action was a substantial cause of damage to him.

Now, there are other cases in which it would not possibly be open to a jury to find that there was a specific intent, and there are intermediate cases where specific intent must be proved by the plaintiff, or if it isn't proved by direct evidence it must be reasonably implied from the total factual situation, including the position of the defendant in the market and the nature of the conduct. That was a very abstract statement, and I am going to try to make it more concrete for you.

Suppose that in a particular market, and I'm going to tell you what a market is in a moment, the defendant has a dominant controlling position, and the defendant is a manufacturer of a particular kind of product, let us say shoe machinery. If the defendant refuses to sell such shoe machinery to people who want to buy it but only will agree to lease it on rental terms so that nobody can acquire the machinery except as a lessee, under those circumstances no matter what the intention of the manufacturer is, the law implies that because of the dominant position which the machinery manufacturer has, and because of the interference with the freedom of choice of the proposed user of the machine there is a sufficient implied intent, and nothing need be proved beyond the position of the manufacturer in the market and the form in which the manufacturer makes his product available exclusively by lease and never by sale.

There are situations which are quite different from that. But before I deal with them I am now going to interrupt my general train to drop a footnote to explain what the term "market" means, which I

1346

have been using frequently and which you have heard counsel use.

The word "market" may mean any identifiable branch of trade or commerce which has that kind of character which those who are in that trade or branch would recognize as creating a sufficient unity of demand and supply, so that there is, as it were a market. And let me come right to the point of this case.

It is up to you to conclude that in this case there is a separate market for batch customers who use computer services or you may conclude that there is no such separate market and there is, in fact, only a market which includes all computer services, whether given on the basis of remote terminals or on the basis of batch deliveries.

The plaintiff has the burden of satisfying you that there is not only the larger market but, indeed, a smaller market, to wit, a market in which the demand and supply relate to batch data services rendered by computer centers. In other words, there can be a large market and a small market.

The plaintiff also has the burden of proving what is geographically the scope of the market. Of course, you could have a batch data market which covered the whole of the United States. You could have a batch data market which covered the whole of the West. You could have a batch data market which covered just the City of San Francisco. You could have a batch data market which covered the Bay Area, including the various counties adjacent to San Francisco.

The plaintiff has the burden of satisfying you with respect to what are the appropriate markets. There may be more than one appropriate market.

If in what you find to be an appropriate market there are a number of different ways of satisfying the demand in that market, you will, of course, take it into account.

For example, with respect to batch data services in the Bay Area, you can take into account what centers there are that render such service by one or another type of machine.

It would be an impermissible restraint of trade if there is, in a given market, a dominant company which coerces customers and interferes with their freedom of choice. If there is coercion by a dominant force in the market, the plaintiff need not prove any further specific intent because the coercion, by itself, implies a specific intent either to monopolize or to exclude from the market or, as it were, to freeze or squeeze.

But, let us take another possibility, hypothetically considered, in order to make clear to you what the law is.

Suppose that a dominant force in the market makes false representations. By themselves, those are not sufficient facts to bring about a violation of Section I of the Sherman Act and to constitute an unreasonable restraint of trade. It is only under those circumstances when the plaintiff proves that the defendant, in addition to being an important force in the market and in addition to having made false representations, did it with the specific intent to monopolize that market or to exclude the plaintiff from that market or to freeze the plaintiff out of the market or to squeeze that plaintiff in an anticompetitive manner.

I think I recognize how difficult this problem is; and that is one of the reasons that after I get through with my statements on the law, I am going to offer you an analysis which you are free to accept or reject.

What I have told you so far is a rule of law.

Now, if I turn from the problems raised by the first issue, that is, did the defendant violate Section I of the Sherman Act, I must help you in one aspect of law which is local and not the Act of Congress but the acts of the California Legislature and the California Courts.

You will surely remember that there was a great deal of testimony with respect to what kinds of pieces of paper and what kinds of contracts, if any, there were in 1970 which bound or did not bind customers to the Burroughs Data Center being operated in San Francisco. The question as to

whether there were any contracts and, if there were contracts, they were as has been said, assignable or delegable with respect to performance is the reason I need now explain to you a question of law of California and not a question of Congressional law.

With respect to this phase of the case, the burden of proof is not upon the plaintiff, the burden is upon the defendant. The defendant has the burden of proving that there were contracts and that they were delegable, assignable, with respect to performance.

It seems to be generally agreed that, on their face, these pieces of paper stated that they did not become contracts unless they were approved in Detroit by the home office of Burroughs Corporation. So, no matter what Mr. Browne or anybody else may have said on the witness stand, it is the position in this litigation at this stage, taken by Burroughs, itself, that there were no written contracts which were in force and effect in 1970, before late in April or thereabout. They were signed in the home office in Detroit by Mr. Bailey or someone there. But the defendant argues here that even though there were no written contracts in 1970, there were contracts by conduct.

Now, the law, with respect to this, is that it isn't necessary that contracts of this kind be in writing. Contracts of this kind can arise by conduct or orally or by the relationship of the parties in many different ways. And it is a question of fact for the jury as to whether, indeed, the relationship between Burroughs' center and its customers in 1970, in January, February, March, and so forth, shows that these customers and Burroughs, by their conduct, intended to be bound.

Now, it has been suggested that the relationship was an ongoing relationship. On the other hand, you are entitled to take into account that the parties may or may not have thought that they wanted the protection of a written agreement and they didn't intend to be bound unless they got a written agreement. That is a question of fact for you.

It may be that some of the customers, certainly not all of them, were charged different rates in 1970 from 1969 and they paid these higher rates and thus showed that they intended to be bound even without any signed approval from Detroit.

I am not trying to tell you whether the conduct did or did not amount to a contract by conduct instead of a contract in writing. It is all a question of fact for you.

The burden with respect to it, unlike the burden on most of the issues on this case, rests upon Burroughs, as defendant. If Burroughs does prove to your satisfaction, by a preponderance of the evidence, that there were contracts by conduct, Burroughs then has the burden of proving too that those were contracts which could be properly satisfied by Burroughs' getting the performance of the contracts done by somebody who was competent but who was not necessarily in the employ of Burroughs.

This has been referred to by the parties and the witnesses as though it were an assignable contract. That isn't exactly the right term, but it is a convenient one.

Was performance under these contracts delegable to somebody else? Could it be assigned to someone else? The plaintiff says no. And you will remember that Mr. Palmer said that, in his view, these contracts were not properly performable except by either the original computer center party or somebody who took over the business as a whole.

The position of the defendant is that contracts of this kind, whether in writing or arrived at by conduct, may be performed by anybody who is a reasonably decent, trustworthy workman-like operator of a computer center.

In that connection, the defendant calls to your attention the testimony of the degree to which this business has been assigned in the past and the evidence with respect to the assignment of business to various companies, including some not parties to this case, including the one, for example, that were testified to by Kalt.

I am not taking any position on this matter. It is for the jury.

I have tried to give you an illustration earlier in the case, as you will remember, but the illustration of the pencil factory and the opera singer, Madame Wagner, is perhaps no longer necessary to have you recall. It would be sufficient for you to think whether, after you have listened to all the testimony, you do or do not have a view that the defendant has proved that this kind of work may properly be delegated to any competent workman-like, trustworthy enterprise.

After that excursion into the problem of contracts and their assignability, I now come back to the main issues in the case and turn to the question which is raised in regard to the plaintiff's claim that there was a substantial impact, as the plaintiff calls it.

In other words, did the defendant, if it violated Section I of the Sherman Act, substantially cause injury to the plaintiff.

Now, it isn't necessary, in order to satisfy its burden of proof, for the plaintiff to show that the defendant was the only cause of the injury. What the plaintiff must show by a preponderance of the evidence was and is that the defendant's wrongful conduct was a substantial cause of the injury.

Now, I would like to draw sharply your attention to something which I am not sure was brought out very clearly in the argument.

The types of injury to which reference was made and on which at least the plaintiff sought to calculate damages are of two different sorts. One is the injury with respect to, as it is claimed, the loss of the opportunity to earn money from Burroughs' customers, who were having their data processed at the Burroughs' center. The other claimed damage and injury was with respect to concerns which had never been customers of either Burroughs or of Computerminal.

If you come to the conclusion that there has been a violation of Section I of the Sherman Act, you may, as I will point out a little later in my analysis, treat these two classes of possible, theoretical customers as having a different kind of relationship, if any, to the alleged violation.

I now come to the third main issue which you may or may not arrive at.

You recognize I have to charge you on every issue raised. It doesn't mean that you have to consider every issue raised. You cannot find for the plaintiff unless you consider all of these issues, but you can find for the defendant without considering them.

This isn't a temptation to you to take the short cut. I am just telling you that the fact is that if you don't find any liability on the part of the defendant, if you don't find any violation of the Sherman Act by the defendant, you don't have to consider anything else.

Now, what about the rules of law with respect to damages? The plaintiff does have the burden of satisfying you by a preponderance of the evidence of the fact of damage, but it is recognized in many cases binding upon you and me that if you are satisfied that the plaintiff has borne the burden of proving the fact of damage a considerable latitude is allowed with respect to the extent of damages.

If the defendant has, indeed, violated the Sherman Act and that violation has been a substantial cause of a particular kind of injury to a particular group of customers or through a particular group of customers, then if the plaintiff has also shown the fact of damage with respect to either or both of those kinds of customers, the defendant runs the risk that those figures cannot be very precisely ascertained because it is wrongdoing, hypothetically, which has created the uncertainty.

Now, there is one other point that I must instruct you on with respect to damages. Notice carefully that on this point the defendant bears the burden of proof, not the plaintiff, just as with respect to the problem in connection with contracts and their assignability and whether or not they exist

by conduct as well as by written agreement, the defendant has the burden of proof.

Before I come to state this issue, I want, in order to sharpen it, to distinguish another somewhat similar but different problem.

If a company is economically ailing and it is possible that it would have gone out of business through its poor management, or the like, the defendant does not get the benefit of that as an excuse for paying less in damages.

If I may give you a homely and frequent illustration, if the defendant, in a personal injury situation, were to hit a man who had had a heart attack and the man was seriously injured, the defendant has to pay for the injury even though, if the man had had no heart attack, the injury might not have been so serious.

You take, in a personal injury or other tort action, including an antitrust action, the plaintiff as he is. And if the defendant injures a weak and sickly corporation and the injury is worse than it would be if it were a healthy corporation, that is no excuse in mitigation of damages.

However, what the defendant claims here is something different. And I am not saying that the claim is sound, I am just placing it in from of you for your consideration, reminding you that on this issue the defendant has the burden of proof.

The defendant says that in this particular case the plaintiff was under a contract to go out of business and, therefore, the period of damage cannot last longer than the period during which the plaintiff had contracted to stay in business or had contracted that it would go out of business. Obviously, if a corporation were created by the legislature to be not a perpetual corporation but a corporation which was to last ten years and you injured the corporation in its ninth year, the only damages which the corporation could get would be what it would have lost in earning power in the tenth year. You couldn't take into account the twelfth, fifteenth, or nineteenth year as you may in the case of a corporation which had perpetual life.

Now, it is the claim of the defendant in this case that as a result of negotiations originated perhaps by Mr. Wessel—it is up to you whether you agree with this—but it is the defendant's contention that there were negotiations between Mr. Wessel and Mr. Leidersdorf and Mr. Coleman, representing either himself or Mrs. Coleman or both, and there were contributions made in the Winter of 1969–1970 under which there was an express agreement that if the remote batch business didn't work out within the period of time contemplated, the whole of the business of Computerminal, batch data as well as everything else, would be abandoned and there was a subscription, according to the defendant, made on that basis and accepted on that basis by Computerminal and that there, therefore, was, in the defendant's view, a contract of termination; so that there could not have been, no matter what the defendant did, any interference with the operations or possible revenues of the plaintiff beyond the period of time which the defendant was to remain in business, the plaintiff having agreed, in the defendant's view, to go out of business, as it turned out, when there was a failure of financing, and going out of business would have occurred, in any event, according to the defendant, in the Summer of 1970.

It is up to the defendant to bear the burden of all of that, and you don't have to believe any of it. You don't have to believe that Mr. Wessel made any such arrangement or that he had any authority to or that there was any ratification of it by a subscription or that there was any firm agreement on the part of the corporation or that the corporation would have gone out of business anyway.

But if you do believe all of those things, if the defendant does persuade you, then that would, of course, impose a legal limitation upon the period that the corporation would have remained in business, regardless of any wrongdoing, if there were any, of the defendant. And that is a fact that has to be taken into account in connection with damages.

Now, I have, I think, said all that I want to say except one other point of law before I turn to the analysis.

You will bear in mind that the pretrial statement and Paragraph 19 of the complaint, as well, make it abundantly clear that the wrong here complained of and here before you for adjudication has to do with an alleged combination between the defendant Burroughs and Cubit and/or customers. If there were any such agreement, it is said to have been one with respect to or having the effect of interfering with the plaintiff's, Computerminal's, rights, not some individual rights.

If there were any such contract, combination, or conspiracy, Paragraph 19 of the complaint and the pretrial statement make it plain that it reached its culmination by the contract of April 16, 1970. That is the date.

I have said all I am going to say about the law, and now I am going to turn to problems of analysis. I underline as strongly as I can that from now on anything I say you may disregard. I am not now hereafter giving you any instructions on the law.

This is not entitled to any more weight than you want to give it. It may or may not help you. You may or may not think it's fair. I am going to try to be fair. As I listened to the arguments, I hope I correctly understood that there was a threefold thrust by Mr. Alioto on behalf of the plaintiff in his argument to you as to why he has shown that there was a prohibited unreasonable restraint of trade by Burroughs.

Now, if I understood him correctly he said, first, there was a specific intent to destroy Computerminal; and, second, he said that the whole situation was one involving coercion by Computerminal and Cubit with respect to customers which Burroughs already had; and, third, he said that there were implied and expressed misrepresentations made by Burroughs which in some cases reached directly to the Burroughs customers and in other cases somehow or other floated down a grapevine, if you float down a grapevine, at any rate, went down a grapevine in the direction of

the total potential market of potential customers, not only those that Burroughs already had or that Computerminal already had, but those that might by possibility show up in the San Francisco area.

Now, let me look at these three different situations or claimed situations, and they may be cumulative, one as well as the other, or they may be alternative, one instead of the other.

Did the plaintiff show by a preponderance of the evidence that the defendant had a specific intent to destroy Computerminal? Well, let's take the strongest thing which wasn't, for some reason, much played upon in the arguments.

Mr. Browne didn't have a very lovely attitude toward the plaintiff, at least by the time the deal fell through, and there is no doubt he wrote a rather ill-tempered memorandum. But there is no evidence, is there, that anybody acted on that memorandum? There is no reason, is there, to suppose that that particular remark, which surely was not one of encouragement, ever got any approval from either Mr. Bailey or anybody else in real authority at Burroughs, or that it was followed up in any way whatsoever? And it is pointed out to you by the defendant that if there were really a specific intent to destroy Computerminal, it's rather strange that Burroughs didn't do what it had a perfect right to do, to recapture the machine for non-payment of rent. Burroughs allowed unpaid rent to accumulate until it was over $100,000 and was, as has been pointed out to you, the real method of financing Computerminal in the continuation of its business. So it's rather hard, isn't it, to look at this evidence and say that Burroughs started out with the intent to destroy Computerminal.

But now let's look at the second of these, as it were, strings to the bow of Mr. Alioto with respect to restraint of trade. You will remember that during the examination of Mr. Browne and at other stages in the case it was brought out by Mr. Alioto that Burroughs was in an ambiguous situation of being both the manufacturer of machines, and in San Francisco the operator or user of

the machines in a center, and that in its capacity as operator or user of machines, Burroughs was in potential, if not actual competition with every other user of Burroughs' machines including, of course, Computerminal and including Cubit, and the suggestion made to you is that it was under these circumstances rather coercive for Burroughs together with one of its competitors at the computer center level, i. e., Cubit, to go to customers of Burroughs and try to persuade them to deal with Cubit and not to deal with anyone else. It is certainly at least a ground for careful inquiry when a manufacturer of a product accompanies one of the users of its product in going to ultimate customers and urging those ultimate customers to use or to take their business to a particular lessee or purchaser of the manufacturer's machines. On its face this could be found, but not must be found, to be a restraint and interference with the free market.

However, you are also to take into account not only that aspect which on its face invites scrutiny, but you are to realize that in this particular situation the manufacturer was not just going around with one user of machines to see ultimate consumers, the manufacturer was going out of business in its own capacity as a user in San Francisco of its own machines. The defendant points out that in its view it was trying to salvage what it had here in San Francisco. It had made up its mind to go out of business in San Francisco, and it wanted to get as much as it could for whatever it had in the way of good will, i. e., customers.

Now, you will remember that early in this charge I referred to the problem of A who owns a business and wants to sell it and X, Y and Z are possible purchasers, and A sells to X and that cuts out Y and Z. And that it must be permissible for A to sell to somebody, even though it does have an adverse effect on the people who want to purchase it, they are restrained but not unreasonably restrained, because if you didn't let A sell to anybody you are really saying you have got to take a loss, you can't sell your business.

Now, surely, the antitrust laws don't prevent Burroughs in its capacity as the operator of a center in San Francisco from selling its business. Surely, the antitrust laws don't operate to prevent Burroughs selling its customer list, and if it has contracts, from selling contracts, or even the hope of contracts.

So the problem is really whether there was any coercion in these particular circumstances, or whether what was going on was merely a salvaging of the business.

Now, in stating the argument both ways, I hope you don't think I am deciding that issue, because that's an issue for you, but that's the problem.

Now, with respect to this, of course, a lot turns on what went on at those conferences. And remember, who has the burden of proof to bring the witnesses. Are you satisfied that you really know what went on at those conferences? Remember that it's the plaintiff's claim that there were a number of customers who were being coerced. I hope I don't misstate it when I say that the only customer that testified here in person, Mr. Zusman, didn't seem to think he had been coerced. And although Mr. Arnstein of Forbes may have taken a different position, all we know about him is what was read in evidence from some prior testimony of his, not by any means a complete account of what he testified on that occasion.

We also know, of course, what Mr. Browne said. And it is perfectly true that Cubit is a named conspirator, and you might not expect Cubit to be called, or you might think Cubit would be called, it's up to you.

Now, let's look at the third string to the bow, the supposed misrepresentation.

Now, Mr. Alioto in his examination of the witnesses certainly took quite a little time, and I didn't mean that he took too much time, to bring out what was said by Mr. Browne and others, but most particularly by Mr. Browne, and what the correspondence and notes, notices and so forth said

about these 1970 pieces of paper or contracts. I don't think you and I would give Mr. Browne a certificate as a representative who understood the law very well before he testified.

And I don't think that you or I would be much impressed with his consistency. I certainly made it plain that I thought he had said one thing one day and another thing another day. And I am not sure if even now he has a clear idea, for that matter, I am not sure that anybody has a clear idea about what the legal situation is with respect to those pieces of paper, because until you have spoken we don't know whether there were contracts by conduct.

There may have been a correct representation, there may have been an incorrect representation. We don't know, until you have spoken, whether those contracts were able to be performed according to their implied intent by any competent company or not. The plaintiff has the burden of showing there was a misrepresentation, but if there were a misrepresentation the defendant could certainly avoid its effect by showing that it was made in good faith. But the defendant would have the burden of showing that it was made in good faith.

Now, you may remember, going back to where I first started to tell you about the complexities of the law with respect to restraint of trade and telling you that I didn't think even all justices of the Supreme Court of the United States would agree upon it, I did make plain to you that when you were dealing with alleged fraudulent misrepresentation or alleged bona fide negligent misrepresentation, there is no violation of the Sherman Act, there is no restraint of trade prohibited by Section 1, unless there is, in addition to the misrepresentation, either a dominant control of the market with an anti-competitive intent or, alternatively, a specific intent to monopolize, to exclude, to freeze out of the market, to squeeze in some way beyond merely injuring.

Now, I hope you realize how difficult these problems are. They are ones in which the common sense of the jury perhaps governs much more than is always recognized, because ultimately, frankly, issues of this kind turn to a large extent upon credibility. You listened to arguments yesterday as to who is truthful, if anybody, and how truthful. As I listened to the testimony I could not help thinking of a line which some of you will know, from Shakespeare's sonnet which talks about that not being love which alters when it alteration finds; that is not truth which alters when it alteration finds. Or, as Archbishop Whately said, there is all the difference in the world between puting truth in the first place and the second. And you are just as good in judging truthfulness as any group of people ever will be.

Now, if you do find that there has been a restraint, you will then have to deal with the question of causation. Now, I, in talking to you about the law, and before I came to the analysis which you are not required to follow, noted that there were two different supposed kinds of customers who would otherwise have given business to Computerminal but who were diverted by the violation of the antitrust laws as claimed.

Now, look at the position of these two classes of customers. There is no doubt, of course, that Burroughs was in touch with its own customers. Burroughs went around and visited its own customers. But what did Burroughs say to its customers? Is there a word of explicit kind indicating that Burroughs ever said anything disparaging about Computerminal? Of course you may disparage without being explicit. If at the moment I were to praise Mr. Alioto and to say nothing about Mr. Gillam, I think in this context you would conclude that I was not only praising Mr. Alioto but dispraising Mr. Gillam, because it would be rather unusual, wouldn't it, in the course of a matter of this kind for me to single out one lawyer for praise unless there was some very exceptional situation?

But here we face the rather peculiar situation that is Burroughs by praising Cubit is supposed to have dispraised Computerminal. Why isn't it equally true that Burroughs was dispraising every other batch data center in San Francisco? And has

anybody said that others thought they were being disparaged? Is there any proof of that?

Now, what about the people who weren't customers of Burroughs but were potential customers. There are people around San Francisco who have or might have batch data work to be done. There is no claim that Burroughs went to see them. But we are told that a grapevine somehow reached them.

What is traveling on this grapevine? That Burroughs sent its work to Cubit? Is there anything traveling on this grapevine about Computerminal? And if it's traveling on this grapevine does the grapevine also say that Burroughs has still left its machine with Computerminal even though Computerminal hasn't paid all of the rent? What kind of grapevine is this?

If the grapevine carries the story that Computerminal isn't paying its rent, it happens to be true.

Well, I am not going to say anything at all about damages. I am well aware that about 60 percent of the testimony, and more, dealt with damages, and maybe almost as much of the argument. If you didn't get what the testimony had to say and what counsel had to say on that, I don't think you will be much enlightened by what I would say. I tell you once more that in connection with this case the burden of proof on each of the three main issues rests on the plaintiff, but there are certain subsidiary issues that I have referred to, such as the supposed contracts and the supposed assignment and any privileges with respect to truth with regard to representation, and any suggestion that there is a shorter life of Computerminal because of its supposed contract with Messrs. Leidesdorf and Coleman are issues as to which the burden of proof rests upon the defendant.

I have tried in the analysis to look at the matter with detachment, but you don't know whether anybody can state a matter so that everybody thinks it is detached. I hope I have the kind of bias against bias which I referred to before. I know that, like everybody else, I am bound to have a certain number of prejudices, but I do my best to combat them.

In the end, I would say that the reason it is so fortunate to have a jury case instead of a nonjury case in this field is because, as I have repeatedly said, the ultimate test here will turn out, I am sure, to be credibility.

Everyone who comes into a court swears by God to tell the truth, the whole truth, and nothing but the truth. I doubt very much whether many people who take the oath fear Jehovah, but most of them fear jurors.

You may or may not think that someday you will face St. Peter or, in the Inferno, Minos, but you are in the position, as it were, of the eternal judge of the truth of this matter. You are engaged in a very solemn undertaking.

This is not a simple case, and I have not been able to reduce it to an easy problem because it isn't easy.

I have been in the habit of saying, for many, many years, that when my children were young and I was already a judge, at the end of a jury case, I would go home and tell my children, as best I could, what were the facts in the case and try to get from them a judgment as to how the case should be decided. In one sense, it worked very well. Both my children have become lawyers.

I am not suggesting that your children will become lawyers, but if you do this job before you in the spirit of imagining that you are to tell your children or grandchildren about this case and what you decided, if you have that sense of conscience that you would have when you were in the position of instructing the young, I have very little doubt that you will reach a sound verdict.

Mr. Clerk, will you please pass the two forms to the Foreman, number one? I don't know whether he is the Foreman or not.

You will see one form is for plaintiff and one form is for defendant. If you find for the plaintiff, you put in a figure in dollars.

You don't give us any reasons or anything of that sort, you just put down the figure. If you find for the defendant, you just fill out the form without any figure.

You, of course, are required to be unanimous, the six of you.

Needless to say, when you go into the jury room, you may start with a difference of opinion. Listen attentively to one another. You are just as good a jury as ever is going to sit on this case. It is very important that you be decisive. After all, it has taken a month of your time, a month and more and a great deal more of counsel's time, and a month of the judge's time, not to mention the parties' and the witnesses' time. It has been an expensive business no matter how it comes out.

Nobody is going to compel you to reach a verdict against your conscience.

It may very well be that you can return a verdict in a very short time. Maybe you can't, but, as I have indicated, if you can't do it quickly, I intend to hold you. If you do it quickly, that is all right, but I am not urging you to avoid staying overnight. That is up to you to act conscientiously.

Is there anything else, gentlemen?

MR. ALIOTO: No, Your Honor.

MR. GILLAM: No, Your Honor.

THE COURT: Will you please retire to consider your verdict under the circumstances usual in this Court, whatever they may be.

What are they, Mr. Waggoner?

You go into the jury room and get the exhibits there and you will have lunch brought to you at such and such a time.

No, you are taken out to lunch. And, if necessary, you will be taken out to dinner.

If you have any messages to send to me, you send them in writing in an envelope through the Deputy Marshal.