LAURIE VISUAL ETUDES,
INC., Plaintiff,

v.

CHESEBROUGH–POND'S, INC.,
Defendant.

No. 76 Civ. 2305.

United States District Court,
S. D. New York.

May 29, 1979.

Marshall, Morris, Powell, Silfen & Cinque, New York City, and Ford, Marrin, Esposito & Witneyer, New York City, for plaintiff; Robert W. Cinque, Thomas R. Esposito, New York City, of counsel.

White & Case, New York City, for defendant; Edward Wolfe, James B. Rather, Norman Yoerg, Jr., New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Laurie Visual Etudes, Inc. ("Laurie" or "Laurie Visual"), is the owner of a patent for a breath exercise device that it has never manufactured, licensed, sold or distributed on a commercial scale. It brings this action against defendant, Chesebrough-Pond's, Inc. ("Chesebrough"), the owner of patents for breath exercise devices that it has manufactured and widely distributed in the commercial market, principally in the medical field. Plaintiff seeks recovery of treble damages from defendant

upon a claim of alleged violation of the antitrust monopoly provision, section 2 of the Sherman Act. Laurie also asserts common law claims for (1) fraud and deceit, (2) unfair competition and (3) breach of fiduciary duty. The Court has jurisdiction over the first claim pursuant to section 4 of the Clayton Act[1] and pendent jurisdiction over the state law tort claims. Upon completion of pretrial discovery by the parties, Chesebrough moves to dismiss the Sherman Act claim pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the ground that Laurie Visual lacks standing to sue, and to dismiss the common law claims for lack of federal jurisdiction.

While the Court is mindful of this Circuit's stringent standard for granting such relief,[2] summary judgment in an antitrust suit following full discovery by both sides is not at all uncommon.[3] Indeed, when the facts justify summary judgment, fairness to defendants in relieving them of the expense and heavy burden of trial preparation and the expeditious administration of justice require that the Court's energies not be deflected by an unnecessary and time-consuming trial.[4] Since the essential facts have been fully developed during the course of extensive depositions of those who were engaged in basic transactions and by documents received during the taking of their depositions, the Court finds the present case appropriate for the exercise of this power.[5]

## I

Plaintiff, Laurie Visual, refers to itself as a sister or affiliate of the "Laurie Companies." The latter have been in existence for over twenty years, wholesaling and marketing products in the music, records and entertainment business. Laurie Visual was formed in the late 1960's to develop a music education program for elementary school children, with Robert Schwartz, one of the three controlling shareholders of the Laurie Companies, as its President.

Harold Hanson, an employee of Laurie Visual and a shareholder, was in charge of developing a music education program. As part of this development in or about 1970, he invented a breath exercise device that would be useful to persons playing wind instruments since its regular use improved

---

1. 15 U.S.C. § 15.

2. *See George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 555 (2d Cir. 1977); *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975) (citing cases). *But cf. SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978) ("the policy favoring the efficient resolution of disputes, which is the cornerstone of the summary judgment procedure, would be completely undermined if unsubstantiated assertions were sufficient to compel a trial").

3. The Supreme Court has cautioned that "in antitrust cases . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly," *Hospital Building Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976), but it has also counselled that once such discovery has been afforded to plaintiffs in an antitrust suit summary judgment is appropriate in "the absence of any significant probative evidence tending to support the complaint." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). *See GAF Corp. v. Circle Floor Co.*, 463 F.2d 752 (2d Cir. 1972), *cert. dismissed*, 413 U.S. 901, 93 S.Ct. 3058, 37

L.Ed.2d 1045 (1973); *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); *Waldron v. British Petroleum Co.*, 231 F.Supp. 72 (S.D.N.Y.1964); *Schwartz v. Broadcast Music, Inc.*, 180 F.Supp. 322, 331 (S.D.N.Y.1959); *Pastor v. American Telephone & Telegraph Co.*, 76 F.Supp. 781 (S.D.N.Y. 1940).

4. *Schwartz v. Broadcast Music, Inc.*, 180 F.Supp. 322, 325 (S.D.N.Y.1959). *See Miller v. Schweickart*, 413 F.Supp. 1062, 1068 (S.D.N.Y. 1976) (citing cases).

5. In determining which asserted facts are established for the purposes of this summary judgment motion, the Court has not accepted conclusory statements but has relied upon established facts. *SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978); *Royal Indem. Co. v. Westinghouse Elec. Corp.*, 385 F.Supp. 520, 523 (S.D.N.Y.1974); *Applegate v. Top Assocs.*, 300 F.Supp. 51, 53 (S.D.N.Y.1969), *aff'd*, 425 F.2d 92 (2d Cir. 1970); *Morgan v. Sylvester*, 125 F.Supp. 380, 389 (S.D.N.Y.1954), *aff'd per curiam*, 220 F.2d 758 (2d Cir.), *cert. denied*, 350 U.S. 867, 76 S.Ct. 112, 100 L.Ed. 768 (1955).

breath control and volume. A patent was issued for this invention, which Hanson assigned to Laurie in 1972. Hanson's friend and physician suggested that the device might be useful in medical therapy since other devices then sold in the market were expensive, and Laurie thereupon became interested in its exploitation for medical purposes. Accordingly, it commissioned studies and had clinical tests made on the device. During 1973 Laurie considered entering the market for medical-purpose breath exercisers in some capacity and commenced negotiations with Chanal Plastics ("Chanal") to manufacture the device.

In March 1974, Laurie entered into an agreement with Chanal. The "Chanal Agreement" provided that Chanal was to develop an acceptable prototype of the exerciser, following which Laurie would enter into a distribution agreement with another company. Thereafter Laurie would "issue a production order to Chanal for the development of the tooling, engineering and plans . . . required for manufacture of the Device." [6] Once the tooling had been developed by Chanal for manufacture at a stated price, Chanal would be granted the exclusive right to manufacture the device for a period of three years.

Plaintiff then contacted Chesebrough, showed it a model that had been worked up by Chanal and subsequently gave it a copy of the patent; Chesebrough undertook its own study of the exerciser. Thereafter, the parties engaged in negotiations. Laurie contemplated an arrangement whereby Chesebrough would be the exclusive distributor of the exerciser in the hospital and medical field, in which it had much experience; among its other activities it had for years been marketing a disposable medical breath exercise device known as the "Blow Bottle." The negotiations extended over a period of approximately nine months with proposals and counterproposals, including one by Chesebrough to pay a "royalty" of a fixed sum per unit over cost. Laurie disputes that a "royalty" was to be the measure of payment. The Court, for purposes of this motion, accepts Laurie's position that it did not want to receive payment in the form of "royalties," due in part to its concern that any "royalty" provision might subject it to taxation as a personal holding company under the Internal Revenue Code.[7]

While these discussions with Chesebrough were in progress, plaintiff sought to interest others in the marketing of the device when and if it were manufactured and sent copies of its patent to at least two other national distributors of medical respiratory instruments—Hudson Oxygen Therapy Sales ("Hudson") and Bird Company. The efforts of Laurie and Chesebrough to reach an agreement fell through toward the end of 1974. So, too, Laurie's efforts to interest Hudson and Bird Company failed, as did its attempt in 1975 to contract with Becton-Dickinson, another national supplier of hospital products. Defendant later developed and patented two breath exercise devices of its own, the "Uniflo" and "Triflo" exercisers,[8] and after market testing in 1975 began to market the products nationally in 1976.

Soon thereafter plaintiff commenced this action, contending that its entry into the medical breath exerciser market was foreclosed by the monopoly power of Chesebrough. Defendant, according to plaintiff, monopolized this market, originally when it had the only disposable exerciser (the Blow Bottle), and continued to monopolize the market when it deliberately prolonged negotiations to delay plaintiff's entry into the market, thereby enabling it to introduce Uniflo and Triflo ahead of plaintiff's device.[9] Defendant's instant motion to dismiss the complaint is made upon the ground that plaintiff does not have standing to sue

---

6. Def.Exh. 4 ' 3.

7. I.R.C. §§ 541-543, 26 U.S.C. §§ 541-543 (imposing tax of 70% of income on "personal holding companies").

8. Plaintiff does not contend that these devices infringe its patent but does charge that they were the result of a breach of defendant's duty to act in good faith in the course of negotiations, which grounds its common law claims.

9. Complaint '' 14–15.

under the antitrust laws in that it had neither business nor property subject to injury and that, assuming it was a viable business entity, any claimed injury was indirect and secondary. ᶜ

## II

Section 4 of the Clayton Act, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor," has been held to require two separate elements for a litigant to have standing to sue: (1) injury to a specific "business or property" interest of plaintiff, which injury is (2) "by reason of" defendant's violation of the antitrust laws in that plaintiff is the direct object, or "target," of defendant's anticompetitive conduct.[10] Plaintiff, faced with the hard fact that it owns a patent for a breath exercise device that it has never manufactured, licensed, distributed or sold in the competitive market, contends that it is "a primary-line manufacturing competitor of Chesebrough . . . who was excluded from the market because of Chesebrough's anticompetitive conduct."[11] However, Laurie's mere assertion that it is a primary-line competitor on the edge of the market does not make it such. The allegation must be tested against the facts.

## A

One purpose of the requirement for standing to sue to recover damages for alleged antitrust conduct is to prevent the treble recovery provision of section 4 from in terrorem use by plaintiffs having speculative claims or seeking windfall recoveries.[12] Thus the threshold determination is whether plaintiff has a concrete business or property interest that can be subjected to injury by defendant's claimed antitrust violations. It is beyond dispute that Laurie never established a business to compete with Chesebrough or with any other distributor of the product in issue. Instead, plaintiff relies upon those cases that hold that it is just " 'as unlawful to prevent a person from engaging in business as it is to drive a person out of business,' " provided that the claim can be supported by evidence that plaintiff had "[the] intention and preparedness to engage in business."[13]

The depositions and affidavits demonstrate that Laurie did have the intent to set up a business enterprise to exploit its patented invention. However, mere intent or desire to enter a market, without more, does not prove "preparedness." Indicia of preparedness include "[t]he background and experience of plaintiff in his prospective

10. *Farnell v. Albuquerque Publishing Co.*, 589 F.2d 497 (10th Cir. 1978); *Waldron v. British Petroleum Co.*, 231 F.Supp. 72 (S.D.N.Y.1964). *See generally* Berger & Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809 (1977); Note, *Standing to Sue for Treble Damages Under Section 4 of the Clayton Act*, 64 Colum.L.Rev. 570 (1964); Note, *Closing the Door on Consumer Antitrust Standing*, 54 N.Y.U.L.Rev. 237 (1979).

11. Plaintiff's Memorandum of Law, at 2.

12. *See Long Island Lighting Co. v. Standard Oil Co. of Cal.*, 521 F.2d 1269, 1273–74 (2d Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1296 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). *Cf.* Berger & Bernstein, *supra* note 10, at 850–58 (noting "countervailing policies" behind antitrust standing cases).

13. *American Banana Co. v. United Fruit Co.*, 166 F. 261, 264 (2d Cir. 1908), *aff'd on other*

grounds, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). *Accord, Solinger v. A&M Records, Inc.*, 586 F.2d 1304, 1309–10 (9th Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); *Hecht v. Pro-Football, Inc.*, 187 U.S.App.D.C. 73, 89, 570 F.2d 982, 994 (1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633 (5th Cir.), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Volasco Prods. Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383, 395–96 (6th Cir. 1962), *cert. denied*, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); *Peller v. International Boxing Club*, 227 F.2d 593 (7th Cir. 1955); *Triangle Conduit & Cable Co. v. National Elec. Prods. Corp.*, 152 F.2d 398 (3d Cir. 1945); *Magnus Petroleum Co. v. Skelly Oil Co.*, 446 F.Supp. 874, 880–81 (E.D.Wis.1978); *DeGregorio v. Segal*, 443 F.Supp. 1257, 1261–62 (E.D.Pa.1978); *Waldron v. British Petroleum Co.*, 231 F.Supp. 72, 81 (S.D.N.Y.1964).

business," any "[a]ffirmative action on the part of plaintiff to engage in the proposed business," its ability "to finance the business and the purchase of equipment and facilities necessary to engage in the business" and "consummation of contracts by plaintiff." [14]

Laurie Visual contends that it has met the criteria of preparedness in that its officers had prior extensive business experience in the distribution of other products, money had been invested to develop the patent, an agreement had been entered into with Chanal for production of the device, negotiations for contracts to distribute the goods were in progress in 1974–75, and after such negotiations had failed, it retained consultants who made field investigations of competitive patterns, including Chesebrough's operation.[15] Accepting these general assertions as true, the question remains: Was plaintiff really, as it asserts, "a competitor, hovering on the edge of the market" in 1976? Did it have a substantial prospect of creating an enterprise to market its patented product, or did it have only an expectancy or hope of entering into a new business which was never realized only because of its own shortcomings?

Laurie argues that the experience of its executives in *manufacturing and marketing* consumer products in the music, record and entertainment business qualifies it to be a competitor of Chesebrough in the market-

ing of medical breath exercise devices. But whatever the Laurie Companies' competence in the entertainment field, it does not qualify them to start a new business in an area foreign to them. Their prior experience in the music and entertainment arena would not prepare Laurie to enter the commercial market for hospital or medical devices any more than an experienced refiner and distributor of crude oil is thereby qualified to manufacture and sell gasoline-operated automobiles. Laurie Visual's own president recognized this business realty when he testified: "The medical field was very foreign to us [the Laurie Companies] and it's a field that we never even looked at. . . . We could be the manufacturers, but it was the area of distribution where we lacked the expertise." [16] Also probative is the Chanal Agreement, upon which plaintiff so heavily relies: Laurie was not to issue any production order to Chanal for the development of the tooling, engineering and plans until it had entered "into an agreement with a distributor for the distribution of the Device." [17] Thus it is unquestioned that Laurie Visual had to depend on a firm with experience to do necessary spadework so that the patented device could be profitably marketed, yet, as we have seen, its efforts to consummate a marketing agreement with Chesebrough and other distributors came to naught.[18]

---

**14.** *Waldron v. British Petroleum Co.*, 231 F.Supp. 72, 81–82 (S.D.N.Y.1964) (citing cases). *See Solinger v. A&M Records*, 586 F.2d 1304, 1309–10 (9th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); *Hecht v. Pro-Football, Inc.,* .187 U.S.App.D.C. 73, 89, 570 F.2d 982, 994 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Martin v. Phillips Petroleum Co.,* 365 F.2d 629, 633–34 (5th Cir.), *cert. denied,* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Denver Petroleum Corp. v. Shell Oil Co.,* 306 F.Supp. 289, 308 (D.Colo.1969).

**15.** Plaintiff's Memorandum of Law, at 4–5.

**16.** Deposition of Robert Schwartz, at 60, 74. *See id.* at 70–71 ("So, after kicking it around for a number of meetings, because it was said, what do we know about marketing medical, and we said, not a damn thing, so it was decided we should develop a company where we would be the manufacturer and they would do

the marketing, and that was . . . in the hospital field."). Schwartz's conclusory allegation in his affidavit in opposition to this motion that "Laurie had the business expertise to be a competitor [of Chesebrough]" is negated by his prior deposition testimony. The utter lack of experience is further emphasized by the testimony of Laurie's marketing consultant that Schwartz recognized "his inexperience and lack of knowledge, which he often admitted, relative to the medical field." Deposition of Charles Norman, at 51.

**17.** Exh. 4 ᶜ 3 (Chanal Agreement).

**18.** *Compare Peller v. International Boxing Club, Inc.,* 227 F.2d 593, 595–96 (7th Cir. 1955) (negotiations looking forward to boxing match, including preliminary financial arrangements and informal understandings, did not establish business for purposes of § 4) *with Deterjet Corp. v. United Aircraft Corp.,* 211 F.Supp. 348

Additionally, Laurie has failed to adduce any concrete facts to show that it was ever in a financial position to commence such a business or that substantial sums were invested by it to exploit the device, apart from the cost of developing the patented product. Indeed, the contention that "Laurie spent over $260,000 to develop its breath exercise device" is a clear overstatement, since Schwartz swears that this sum was expended on Laurie's entire musical education program, which was determined to be "not worthwhile," but whose failure yielded "one very valuable fall-out" —the breath exercise device, which came quite late in the development of the program.[19] Moreover, the negotiations with Chesebrough demonstrate that Laurie needed a large and seasoned national distributor not only because of its own lack of expertise but also because it sought the advantage of the financial resources that an established distributor could employ in furtherance of marketing activities. Plaintiff's unsupported assertion of financial capacity to undertake the financing of a venture into a new and untried field is attenuated by the fact that in its bargaining with defendant it sought advance payments by defendant during the development period.[20]

Schwartz's mere statement during his deposition that Laurie was "seriously considering going into the marketplace on a limited basis" without the aid of a large distributor[21] must yield to the reality of the situation. The combined efforts of Laurie and Chanal have resulted, to date, in nothing more concrete than a set of blueprints

and a handmade model of the exerciser. The facts establish that it was crucial to Laurie's entry into the market that it find a firm that could distribute its product nationally and underwrite the enterprise with substantial assets, yet plaintiff's negotiations not only with Chesebrough but also with other distributors—Bird Company, Hudson and Becton-Dickinson—were unfruitful.

Plaintiff's failure either alone or with Chanal to manufacture its device and its failure to enter into a marketing agreement demonstrates that its plans to enter the market were never more than inchoate; they were entirely contingent upon a "nonexistent but hoped-for contract [for distribution]—one that presumably was in some stage of negotiation but which aborted."[22]

That Laurie was lacking in "preparedness or capacity" to enter the market is underscored by its own decision when, despite a recommendation by its marketing consultant, it did not do so. Laurie had retained one Charles Norman, a former employee of defendant who had extensive experience in packaging, promoting and marketing products in the health care field. In 1977, about a year after Chesebrough's introduction of Uniflo and Triflo, Norman counselled Laurie to enter the market with its patented device on the grounds "it would still be a worthwhile venture, recognizing it would take a certain amount of capital and other expertise, such as manufacturing facilities, etc., in order to make the product."[23]

(D.Del.1962) (fledgling company with facilities to produce new device and particular arrangements to market it had standing under § 4).

**19.** Plaintiff's Memorandum of Law, at 4; Affidavit of Robert Schwartz ¶ 4(b); Deposition of Robert Schwartz, at 23. *Cf.* Complaint ¶ 10 (alleging cost of developing musical education program was "in excess of $150,000"). The money expended on inventing and patenting the exerciser cannot be considered as part of Laurie's expenses in entering or planning to enter the market for medical or hospital devices. *See Triangle Conduit & Cable Co. v. National Elec. Prods. Corp.,* 152 F.2d 398 (3d Cir. 1945); *Denver Petroleum Corp. v. Shell Oil Corp.,* 306 F.Supp. 289 (D.Colo.1969).

**20.** Deposition of Harold Rosenblum, at 67; Exh. 6.

**21.** Deposition of Robert Schwartz, at 421.

**22.** *Waldron v. British Petroleum Co.,* 231 F.Supp. 72, 83 (S.D.N.Y.1964). *See Hecht v. Pro-Football, Inc.,* 187 U.S.App.D.C. 73, 89–90, 570 F.2d 982, 994–95 (1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978).

**23.** Deposition of Charles Norman, at 52. In response to defendant's citation of this advice, the Affidavit of Robert Schwartz ¶ 4(j) asserts that the real reason Laurie did not enter the market in 1977 was "that Mr. Norman had informed us of Chesebrough's technique for

Plaintiff failed to act on this advice and never attempted to manufacture, promote or distribute the product. Plaintiff as the owner of its patented device has been free to manufacture, market and exploit its product, yet it has failed to enter into the economic arena. Despite its efforts Laurie has been stalled on dead center with respect to its patented breath exerciser.

The facts compel the conclusion that the only reason for Laurie's nonentry into the market for medical breath exercisers has been its own incapacity. The Court finds that it was neither a competitor nor a potential competitor of defendant and that it had no "business or property" that was subject to injury by the alleged antitrust conduct. Its only business or property is the ownership of its patent, as to which its rights remain intact.[24] Apart from the foregoing, another factor requires dismissal of plaintiff's antitrust claim.

### B

■ The second requisite for antitrust standing is grounded upon the policy that the "floodgates" of excessive litigation would be opened by "[c]ontourless rules of causation" and that person injured only by the "foreseeable ripples" of an antitrust violation do not have a cause of action. The rule is that "plaintiff must allege a causative link to his injury which is 'direct' rather than 'incidental' or which indicates that his business or property was in the

'target area' of the defendant's illegal act."[25] Both parties here recognize that our Court of Appeals has repeatedly held that a patent licensor is not directly injured by a monopoly or conspiracy harming the business of its licensees, since it suffers only a "loss of royalties or sales that might have been made by its licensee save for the antitrust violations of defendant."[26]

■ The parties have fashioned their positions accordingly. Defendant contends that plaintiff's sole business is that of a patent holder, which contention plaintiff disputes. It disavows that it is suing as a patent licensor and stresses that in its negotiations with defendant it always cast itself in the role of manufacturer, with Chanal as the submanufacturer, and that its goal in the new field was to function as it did in the music and entertainment market. Laurie's avowal that it did not plan to function as a patent licensor and that its intent was to play the role of manufacturer, whether for tax avoidance or other reasons, does not conclude the matter. Plaintiff's cloaking itself with a particular garb cannot cover the true nature of its planned business activity: "It is still necessary to examine a given plaintiff's role in these processes to determine whether it has the requisite relationship to the type of wrong alleged."[27] The issue is whether Laurie, had its plans borne fruit, would have entered the market as a "remotely situated" entity, the sort of "creditor, stockholder, employee, subcon-

---

disciplining competitors." This hearsay statement is inadmissible. Fed.R.Civ.P. 56(e). Moreover, although Norman's deposition was taken, at no time did he offer such testimony; nor was any affidavit by him submitted in opposition to this motion.

**24.** *See Pastor v. American Telephone & Telegraph Co.,* 76 F.Supp. 781 (S.D.N.Y.1940); cases cited in note 26 *infra.*

**25.** *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183, 187 (2d Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). *See Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); *SCM Corp. v. Radio Corp. of America,* 407 F.2d 166 (2d Cir.), *cert. denied,* 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969); *Petroleum for Contractors, Inc. v.*

*Mobil Oil Corp.,* 1978–2 Trade Cas. (CCH) ⸢ 62,352 (S.D.N.Y. Nov. 20, 1978); *Carnivale Bag Co. v. Slide-Rite Mfg. Co.,* 395 F.Supp. 287 (S.D.N.Y.1975).

**26.** *Productive Inventions, Inc. v. Trico Prods. Corp.,* 224 F.2d 678, 679 (2d Cir. 1955), *cert. denied,* 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956). *See SCM Corp. v. Radio Corp. of America,* 407 F.2d 166 (2d Cir.), *cert. denied,* 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969); *Zimmel Assocs. v. Warner Bros.,* 1977–1 Trade Cas. (CCH) ⸢ 61,249 (E.D.N.Y. Jan. 13, 1977) (citing cases).

**27.** *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183, 188 (2d Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

tractor, or supplier of goods and services" that might be only indirectly affected by the alleged monopoly over the breath exerciser market, or whether its business would have been within the target area of defendant's alleged antitrust conduct.[28]

Upon the facts, Laurie was not to make the device; the exclusive manufacturer was to be Chanal. Laurie had no plant or facilities to manufacture the product; it relied upon Chanal for both plant and facilities. Plaintiff was not to assemble and package the product; it contemplated that a normal distributor would perform these tasks. Laurie was not to distribute or market the exerciser; this, too, was to be done by a national distributor such as Chesebrough. The case of *Billy Baxter, Inc. v. Coca-Cola Company*[29] is controlling. There, the Court of Appeals for this Circuit denied antitrust standing to a franchisor which not only licensed dealers of its registered line of carbonated beverages, but also purchased beverage extracts and resold them to the franchised bottlers and engaged in various advertising and promotional activities. The franchisor had no plant or facilities for manufacturing beverages or their ingredients and derived its profits wholly from the fixed profit it made on each case of the beverage sold by the franchisees. Despite the fact that "antitrust violations might do some damage to all the entities connected with . . . production and distribution" of carbonated drinks, the Court found that plaintiff's conscious decision to "authoriz[e] others to bottle and sell the beverages" set it outside the primary target area of the asserted antitrust violations.[30] Similarly, in this case plaintiff deliberately chose to structure its planned enterprise so that one company would make its device; another firm would assemble, promote and distribute it; essentially, plaintiff would derive a profit reflecting the difference between the amount received by it from the distributor and the amount it paid to the manufacturer of the device.[31] The connection between a monopoly and the claimed injury in this case is, if anything, more attenuated than it was in *Billy Baxter*.

Plaintiff's explanation of how defendant's conduct foreclosed it from the market and why it failed to enter is nebulous. The only allegation that directly relates to plaintiff is that while it was engaged in negotiations with defendant the latter acted in bad faith to pirate plaintiff's device and exploit information disclosed in confidence and to delay plaintiff's entry so that it could develop Uniflo and Triflo before plaintiff could enter the market. Assuming this is so, it is unclear just how this conduct had the effect of preventing plain-

---

**28.** *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295–96 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972).

**29.** 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

**30.** *Id.* at 188. *See id.* at 191 (Waterman, J., dissenting) (suppliers of ingredients to customers victimized by antitrust violations do not have standing). Courts in this Circuit have often reiterated the *Billy Baxter* rule. *See Long Island Lighting Co. v. Standard Oil Co. of Cal.*, 521 F.2d 1269, 1274 (2d Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1294–95 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); *NAACP v. New York Clearing House Ass'n*, 431 F.Supp. 405 (S.D.N.Y.1977).

**31.** Accordingly, this case is distinguishable from *Sulmeyer v. Seven-Up Co.*, 411 F.Supp.

635 (S.D.N.Y.1975). Finding standing for a franchisor-supplier of concentrates used in carbonated beverages to sue for an alleged monopoly in the market of concentrates for lemon-lime soft drinks, the Court distinguished *Billy Baxter* on the grounds that the plaintiff in *Billy Baxter* had only a "circumscribed role" in the distribution of the product, had no physical plant and only functioned out of an administrative office set-up, and was harmed only insofar as it lost royalties, while in *Sulmeyer* plaintiff "asserted that it, like defendants, manufactured concentrates, franchised bottlers, supplied advertising and promotional material, offered substantial assistance to its franchisees, and was actively involved in supervising the work of the franchisees." 411 F.Supp. at 638. Laurie Visual's activities are closer to the circumscribed role of *Billy Baxter* rather than the active, primary business presence of the plaintiff in *Sulmeyer*.

tiff from manufacturing its device and entering the market or "eliminating Laurie as a competitor in the breath exercise device industry and perpetuating and entrenching Chesebrough's monopoly of the industry." [32] Plaintiff was at all times free to challenge defendant's preponderant position; indeed, the evidence that seven or eight firms did enter the market in 1976 and 1977,[33] whereas plaintiff did not, has not been challenged. The claim of defendant's bad faith conduct during negotiations, the sum and substance of plaintiff's case, is not an "*antitrust* injury, which is to say injury of the type that antitrust laws were intended to prevent"; [34] it is more accurately characterized, as Laurie does in its complaint, as allegations of state law "fraud and deceit, unethical conduct, misuse of trade secrets and unfair competition." [35] We have already observed that the hearsay statement of alleged predatory conduct by defendant directed toward a competitor is without probative force.[36]

In general, plaintiff has attempted to assert an antitrust claim when its true grievance is grounded in the common law. To allow it to press such claims to a full trial on the merits would be to permit a subversion of the Sherman and Clayton Acts from their true purpose—"the protection of *competition*, not *competitors*." [37] Laurie's claims should be presented in the proper forum, the New York courts, not in the federal courts under the thin veil of a federal cause of action. Or, as Judge Friendly has observed, "[c]ombining an assertion of general antitrust violation with a claim of injury from breach of contract or tort does not automatically make the latter a claim arising under the antitrust laws." [38]

The Court dismisses plaintiff's antitrust charge. Its pendent claims are so clearly rooted in state law that in the absence of requisite federal jurisdiction they should be pursued in the state courts. Accordingly,

32. Complaint ¶ 17(h).

33. Deposition of Arthur Huber, at 196–97, 212–15, 217, 221, 243–45, 252–53, 255–56, 273–75. *Compare* Deposition of Charles Norman, at 40, 66–67 (at end of 1978, Norman, market consultant of Laurie, advised that "because of the number of competitive devices in the market that it would not be wise for Laurie to go into the medical field") *with id.* at 52–53 (in 1977 Norman "thought that the market was quite viable for [Laurie] to enter especially since [it] had a patented device").

34. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). *See Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 447 F.Supp. 867, 877–78 (S.D.N.Y.1978); *NAACP v. New York Clearing House Ass'n*, 431 F.Supp. 405, 411 (S.D.N.Y.1977).

35. Complaint ¶ 17. Thus the hard core of plaintiff's complaint is not that Chesebrough had or exercised monopoly power in the industry, but that it deceived Laurie and pirated its invention during their confidential negotiations in 1974. These are not antitrust claims. The state courts of New York, where both parties are incorporated, provide relief for misappropriation of trade secrets, *see Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 190 N.Y.S.2d 977, 161 N.E.2d 197 (1959); *Dior v. Milton*, 9 Misc.2d 425, 155 N.Y.S.2d 443 (1956); *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d

774 (2d Cir. 1964) (applying New York law), and fraud and false representations, *see Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); *Lanzi v. Brooks*, 54 A.D.2d 1057, 388 N.Y.S.2d 946 (1976), *aff'd*, 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977).

36. *See* note 23 *supra.*

37. *Brown Shoe Co. v. United States*, 370 U.S. 293, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 150 (1962) (quoted in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)).

38. *Salerno v. American League of Professional Baseball Clubs*, 429 F.2d 1003, 1004 (2d Cir. 1970), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971). *See Karlinsky v. New York Racing Ass'n*, 517 F.2d 1010, 1013 (2d Cir. 1975); *George R. Whitten Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 558–62 (1st Cir. 1974) (Coffin, C. J.), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Kaplan v. Burroughs Corp.*, 426 F.Supp. 1328 (N.D.Cal.1977) (Wyzanski, J.); *General Communications Engineering, Inc. v. Motorola Communications & Electronics, Inc.*, 421 F.Supp. 274 (N.D.Cal.1976); *Vogue Instrument Corp. v. Lem Instruments Corp.*, 40 F.R.D. 497, 499 (S.D.N.Y.1966).

the Court, in its discretion, also dismisses the pendent state claims.[39]

**39.** *See Federman v. Empire Fire & Marine Ins. Co.,* 597 F.2d 798 (2d Cir. 1979); *NAACP v. New York Clearing House Ass'n,* 431 F.Supp. 405, 411 (S.D.N.Y.1977) (citing cases).