OPINION OF THE COURT
Richard W. Wallach, J.
This is an action for an injunction and money damages based upon alleged unlawful appropriation of “novel concepts and trade secrets”. Three causes of action are set forth in the complaint: fraud, unfair competition and breach of fiduciary duty. The proof before the court failed to establish the fraud count; however the latter two claims were proven by a preponderance of the credible evidence.
*414 1. Prior litigation
These parties, both domestic corporations, began this litigation as an antitrust action in the United States District Court for the Southern District of New York under section 4 of the Clayton Act (US Code, tit 15, § 15) with the causes of action presently before this State court joined under the doctrine of pendent jurisdiction. After the completion of full discovery the Federal court in May, 1979 (473 F Supp 951, Weinfeld, J.) summarily dismissed the action under Rule 56 of the Federal Rules of Civil Procedure on the sole ground that plaintiff (Laurie) had failed to establish an injury to specific business or property by reason of any violation by defendant (Chesebrough) of the Federal antitrust law. Federal jurisdiction was lacking in that Laurie could not show that it was a competitor of Chesebrough, even to the extent of “hovering on the edge of the market” in the relevant 1978 period, and therefore the requisite injury to competition was not shown. However Judge Weinfeld carefully severed the pendent State claims stating: “Laurie’s claims should be presented in the proper forum, the New York courts, not in the federal courts under the thin veil of a federal cause of action” (473 F Supp at p 960; see, also, pointed comment at 35, p 960).* It was for this reason, namely that the Federal dismissal was based on the absence of injury to competition through the exercise of monopoly power, and not any lack of-possible injury to Laurie as a would-be competitor, that this court dismissed in the course of trial from the Bench Chesebrough’s defense of collateral estoppel based on the Federal dismissal — a defense first advanced on the eve of trial in its amended answer to the amended complaint.
2. Chesebrough’s Appropriation of the Laurie Device
The subject of this lawsuit is a simple breath exercising device consisting of a transparent plastic cylindrical tube *415 containing a ping pang ball, to which is attached a flexible tube and mouthpiece. When air is either blown in or out of the tube, a valve arrangement at the top of the cylinder causes the ball, which rests on a nipple on the bottom of the cylinder, to rise up to the top. The rotating valve at the top consists of round holes of diminishing diameters; the smaller the hole selected the greater the volume of air intake or exhaust must be in order to raise the ball. Harold E. Hanson, a principal stockholder of Laurie, invented the device and assigned it to Laurie; a United States patent application was filed on August 17,1970, and on October 3, 1972, the invention was awarded United States Patent No. 3,695,608.
Organized in 1967, Laurie has at all times been primarily in the music business. Originally the Laurie device was conceived as an aid to the development of breath control for students of wind instruments. Hanson first became alerted to the possibility of a profitable application in the medical field after showing the device to his personal physician; the interest of the Laurie management in a medical application was further kindled by a favorable report from Dr. Hans G. Keitel in October, 1972. But outside of engaging Chanal Plastic Corp. as an exclusive manufacturer by agreement dated March 11, 1974, Laurie was unable commercially to exploit the device, and began to cast about for a company with experience in the medical and hospital field.
On April 20, 1974, Laurie’s president, Robert M. Schwartz, met with Douglas Keasling, Chesebrough’s new products manager, and Charles W. Norman, Keasling’s immediate superior, at the latter’s offices at Greenwich, Connecticut. The following day a further meeting between Schwartz and John D. McCook, a section head of the Chesebrough Research and Development (R & D) staff together with other Ch'esebrough personnel took place. The Chesebrough executives expressed interest in the Laurie device as complementary to a product they were presently marketing for the same purpose — “the blow bottle”. This latter contrivance consists of two thermos-sized plastic bottles. A patient in need of lung exercise is encouraged to blow into a tube; the resultant air pressure transfers a colored *416 liquid from one bottle to the other. The blow bottle is considerably more cumbersome and un wieldly than the Laurie device.
Following these meetings Laurie was encouraged to provide prototype models and detailed drawings. Considerable delay ensued which Chesebrough represented as necessary to evaluate the product with the potential market. By the end of September the Chesebrough legal department, represented by Robert F. Mitchell, Esq., was ready to negotiate business terms, and a preliminary meeting between Mitchell, Schwartz, and Laurie’s attorney, Rosenbloom, took place on October 4, 1974, in New York City at luncheon at the Algonquin Hotel. Following this meeting Chesebrough, through Mitchell, made two written proposals dated November 6 and November 27, 1974, neither of which was at all satisfactory to Laurie. While these proposals may have been hardnosed, by no means can they be considered sham and put forth for pure stalling as argued by Laurie. The court expressed itself on the record with the view that attorney Mitchell was proceeding in good faith in an attempt to conclude a mutually profitable arrangement.
Regrettably for Chesebrough, the same conclusion cannot be reached with respect to others in the management hierarchy, namely Frank L. Stamberg, in 1974 the general manager of the hospital products division, Keasling, McCook, and others of the research and development and packing departments. From the testimony and exhibits in the record the court finds that as early as August — a full month before the first business negotiation — a fall back plan was developed by the Chesebrough management to develop their own air column breath exercise device in the event that a favorable deal could not be driven with Laurie.
The reason for this attitude is not obscure: Chesebrough’s executives bridled almost immediately at the (for them) vexing circumstance that Laurie had an exclusive manufacturing arrangement with Chanal Plastics which Laurie was unwilling to sever. Chesebrough wanted to control the manufacture and treat Laurie as an “inventor” entitled to a royalty; Laurie insisted on the status of a manufacturer (through Chanal) with Chesebrough granted an exclusive *417 right to buy provided certain minimum purchase requirements were met.
Thus on August 28 Keasling writes in a memorandum to Norman referring to the Laurie.device: “We may have option to circumvent the patent and design our own product.” McCook presciently makes a handwritten note next to this: “We always have that option.” Clearly that “option” became thereafter the serious preoccupation of the research and development sector of Chesebrough. In interoffice memoranda dated October 13, October 29, and October 30, the following entry appears under “Laurie Project”; “R & D not favorable to arrangement with manufacturer. Packaging wants time to circumvent patent.” The October 30 memorandum, which was addressed directly to Stamberg, contains the following handwritten note of Keasling: “Internal effort to abort association and begin again.” And under date of November 27 Keasling writes: “Continued effort will be made to develop a unit that provides similar values as does the Laurie unit.” (Emphasis added.) And by January 2, 1975, the “Laurie project” had become “the knockoff project”.
3. The Laurie Device Constituted a Trade Secret
The court finds that “project knockoff” (although explained by Keasling in his deposition before trial as “an emotional reaction”) provides an apt description of Chesebrough’s ultimate approach to the negotiations with Laurie. The court is satisfied that the concept of a respiratory device consisting of a light ball in a tube applied in the medical context of lung rehabilitation therapy to be a genuine trade secret, which after Chesebrough marketed its “Uniflo” and “Triflo” devices, underwent the sincerest form of flattery— hasty imitation by many of Chesebrough’s competitors. Under examination by the court defendant’s own expert, Brian G. Brunsvold, virtually conceded that Uniflo was distinguishable from the Laurie device only as a simplification. The court further finds that Triflo is a direct derivative of the original Laurie trade secret. The Laurie and Chesebrough products invite the test announced by Justice Clifford in Machine Co. v Murphy (97 US 120, 125) that one device cannot be held to constitute an independent invention *418 over another “if it performs substantially the same function in substantially the same way to obtain the same result”. (Emphasis added.) Under that three-pronged test the Laurie device is found simply to have been taken over by Chesebrough with first a cosmetic (Uniflo) and then a clearly derivative (Triflo) change.
Chesebrough, listing its employee Ron Russo, who was hired in September, 1974, as inventor, has obtained United States Patent Nos. 4,086,918 and 4,114,608 covering Uniflo and No. 4,114,607 covering Triflo. Chesebrough has argued that these new patents demonstrate independent invention. This proposition was substantially undercut by the simultaneous contention that the Laurie device was devoid of invention by reason of the prior state of the art disclosed in the Hanson patent. Although the issuance of a patent carries with it a presumption of invention, the fact is that neither of these parties wished to subject his patents to the risk of an infringement action — Laurie in this case, or Chesebrough in litigation against any of its subsequent imitators. Obviously each fears the declaration of invalidity which is the end result of so many infringement suits (e.g., Timely Prods. Corp. v Arron, 523 F2d 288). Lack of invention in the patent sense, however, does not mean that an idea, not yet thought of by anyone else, disclosed in a confidential setting, is not entitled to trade secret protection under familiar equitable principles of unjust enrichment. (Minnesota Min. & Mfg. Co. v Technical Tape Corp., 23 Misc 2d 671, 684, affd 15 AD2d 960.) “One does not have a right to secure a trade secret or invention by reason of a confidential relationship and to use it without accounting to the source”. (Ewen v Gerofsky, 86 Misc 2d 913, 918, affd 72 AD 2d 976.)
4. The Applicable Law
Since the Laurie air column device as utilized in the medical field was, in 1972, a genuine trade secret, attention must focus upon the manner in which Chesebrough acquired it. It is undisputed that the means of this acquisition was in the context of negotiations during which Laurie was induced to make full disclosure. Even in the absence of any express agreement to hold the disclosed informa *419 tian in confidence and not to use it, the law creates in such circumstances a confidential relationship which restricted Chesebrough from utilizing the disclosure for anything other than the purpose of the disclosures themselves— here a royalty agreement or other mutually advantageous relationship. (Schreyer v Casco Prods. Corp., 180 F2d 921; Franke v Wiltschek, 209 F2d 493; Pachmayr Gun Works v Olin Mathieson Chem. Corp., 502 F2d 802; Filtex Corp. v Atiyeh, 216 F2d 443; Servo Corp. of Amer. v General Elec. Co., 337 F2d 716.)
Chesebrough’s main defense to the liability imposed in the above-cited cases is that issuance of the Laurie device in the Hanson patent in 1972 was publication of the invention and “that there is no cause of action for the use of an idea claimed to have been communicated in confidence when that idea has been made public by the issuance of a copyright or patent prior to its use” (Lemelson v Kellogg Co., 440 F2d 986, 987). The breadth of that dictum in Lemelson is at variance both with the settled precedents in the cited authorities and reaches entirely beyond the actual facts of the case. In Lemelson, the plaintiff inventor pressed his idea for cutout masks on the back of cereal boxes upon an unwilling Kellogg Company which summarily rejected the uninvited proposal. No confidential disclosure of any kind was invited; on the contrary, it was firmly rebuffed. Likewise distinguishable is the decision of the Second Circuit in Syeedry Chem. Prods. v Carter’s Ink Co., 306 F2d 328), a decision upon which defendant places heavy reliance. In that case, the Speedry Company had obtained a patent upon and was producing a “magic marker” writing device in which Carter became interested. A meeting between the executives of both companies took place to negotiate a licensing agreement. The Second Circuit found that the meeting, attended by counsel for both sides, was confined to negotiation of the business terms of a proposed licensing agreement and that no divulgence of confidential information took place there. However, in dismissing the action the court was careful to bring its decision into harmony with the principles of Schreyer v Casco Prods. Corp. (190 F2d 921, supra) as follows: “Whatever information was ascertained from their examinations was *420 already in the public domain * * * While defendant could use this information with impunity, limited only by the restriction of the patent involved, it would be liable if it used trade secrets divulged by plaintijfs rather than the information in the public domain.” (306 F2d 328, 332, supra; emphasis added.)
Chesebrough also cites M & T Chem. v International Bus. Machs. Corp. (403 F Supp 1145, 1149), which contains the observation that “a misappropriator may use information it had previously acquired of a trade secret after the latter has been generally published.” It is fair to say that in this instance this court finds the prevailing Federal jurisprudence to be otherwise. The Second Circuit rule, if indeed it be different from the others would not bind this court on a mere geographical basis. As Judge Weinfeld recognized in his remand of this action to the State forum, it is State law which must control a misappropriation of trade secret claim under Erie R.R. Co. v Tompkins (304 US 64), as distinct from a patent infringement claim as to which the Federal court has pre-emptive jurisdiction. (See American Harley Corp. v Irvin Inds., 27 NY2d 168, cert den 401 US 976.)
In Smith v Dravo Corp. (203 F2d 369) the court in a similar misappropriation case applied Pennsylvania law, since the confidential disclosure took place there. This court invited the parties to consider the applicability of Connecticut law for the same reason; that invitation met with no response. Accordingly the court is entitled to assume that the law of Connecticut would accord with that of New York (Cousins v Instrument Flyers, 44 NY2d 698; cf. Government Employees Ins. Co. v Sheerin, 65 AD2d 10). New York, as we have seen, will protect this disclosure (Minnesota Min. & Mfg. Co. v Technical Tape Corp., 23 Misc 2d 671, affd 15 AD2d 460, supra; see, also, Lakoff v Lionel Corp., 207 Misc 319, where an affirmative defense of prior publication was stricken as insufficient in law). And whether prior publication of a patent operates as an ex-tinguishment of a confidentially disclosed trade secret be regarded as an open question under New York law, this court would follow prevailing Federal law in preference *421 to a suppositious Second Circuit doctrine to the contrary, on the ground that this choice of law avoids the utter anomaly of casting the patent holder in a far worse position than one whose secret lacked sufficient novelty to support a patent.
The prevailing rule appears to be that publication by way of patent or otherwise will destroy a trade secret with respect to those who use the published information without taking advantage of direct confidential disclosure (American Cyanamid Co. v Power Conversion, 71 Misc 2d 213). However, those who acquire the “published” information by way of confidential disclosure are barred from appropriation, and if such misappropriation occurs the aggrieved party is entitled to compensation. Thus where defendant acquires knowledge in the course of confidential communication based upon even an invalid patent, the disclosure is protected (Servo Corp. of Amer. v General Elec. Co., 337 F2d 716, supra). The same is true where the disclosed device is the subject of an expired patent (Franke v Wiltschek, 209 F2d 493, supra). Likewise protection is afforded when other forms of publication make the information generally available and yet the route by which the defendant actually acquires the information is in the form of confidential disclosure (Smith v Dravo Corp., 203 F2d 369, supra).
Thus Chesebrough’s reliance on the prior publication of the Hanson patent as a defense to its misappropriation of Laurie’s trade secret must fail in this case.
5. Damages
Chesebrough’s Uniflo and its Triflo spinoffs enjoyed a considerable market success. Gross sales of these devices from 1975 through the first seven months of 1980 were $13,549,343 on 193,282 units.
 The amended complaint seeks an injunction, an accounting for profits, punitive damages, and counsel fees. Injunctive relief is denied on the ground that plaintiff’s remedy at law is fully adequate. Counsel fees are denied. As for the appropriate measure of money damages, the *422 cases have permitted recovery of the investment made (Package Closure Corp. v Sealright Co., 141 F2d 972) and all profits realized (Booth v Stutz Motor Car Co. of Amer. 56 F2d 962). Because of the intensive marketing efforts of Chesebrough together with the additional improvements it provided, neither of these is proper here. Despite its own efforts, Laurie never had the capacity or knowledge profitably to market its device. Plaintiff’s counsel conceded in summation that the fixation of a fair royalty would be acceptable relief. The court agrees, and fixes the proper royalty at 10% of gross sales..Such a royalty was approved under similar circumstances in Filtax v Atiyeh (316 F2d 443, supra).
The court finds that punitive damages are inappropriate here and declines to award them. There was testimony in the record that Chesebrough’s research and development section chief, McCook, and others acted upon the mistaken belief that prior publication of the patent protected them in their efforts to circumvent it. This notion was not so far fetched as to trigger the imposition of punitive damages.
The figure of 10% is derived in part from the actual negotiations of the parties. The evidence showed that Laurie would have been satisfied with a profit of 22 cents on each unit sold; if the sales price to the dealer were $1.65, as envisioned by Laurie, this would amount to a 13.13% “royalty”; on the other hand the actual sales price on the early units was closer to $3 which would produce a 7.3% royalty. The 10% figure lies midway between these computations. It is also true that Chesebrough is a wrongdoer, and “there is no duty to exercise meticulous care to avoid a hardship” on such a party (Horvath v McCord Radiator & Mfg. Co., 100 F2d 326, 335).
Accordingly, plaintiff is entitled to enter judgment in the sum of $1,354,934 with interest on the stipulated gross sales for each successive year from 1975 through 1979 computed from July 1 of the respective year, and with interest on the sales made during 1980 from March 15, 1980. Plaintiff is also entitled to a declaration in the judgment that its share in all ensuing gross sales commencing *423 August 1, 1980, shall be 10%, to be remitted quarterly on the fifteenth day following the completion of each quarter together with a verified statement of gross sales.

 Footnote 35 reads in part: “Thus the hard core of plaintiff’s complaint is not that Chesebrough had or exercised monopoly power in the industry, but that it deceived Laurie and pirated its invention during their confidential negotiations in 1974. These are not antitrust claims. The state courts of New York, where both parties are incorporated, provide relief for misappropriation of trade secrets”.